Filed 4/7/23

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DESIREE MARTINEZ,<br><br>　　　Plaintiff and Appellant,<br><br>　　　　　　v.<br><br>CITY OF CLOVIS et al.,<br><br>　　　Defendants and Appellants. | F082914<br><br>(Super. Ct. No. 19CECG03855)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi C. Kapetan, Judge.

Lozano Smith, David J. Wolfe, Mark K. Kitabayashi and Michael R. Linden for Defendants and Appellants.

Central California Legal Services, Patience Milrod, Alfred A. Gallegos, Jesse Avila; Public Interest Law Project, Valerie Feldman and Michael Rawson for Plaintiff and Appellant.

-ooOoo-

This case involves the important statewide issue of assuring affordable housing opportunities to lower income families in California. The California Legislature has long recognized the lack of housing in California is a critical problem, finding "California has a housing supply and affordability crisis of historic proportions" affecting millions of citizens because of a failure to "effectively and aggressively confront the crisis."[1] The historic proportions of the affordability crisis have arisen despite the Legislature's measures addressing the need for housing. For instance, in 1965 the Legislature mandated that the general plans of all cities and counties include a "housing element" that is updated periodically to accommodate the housing needs of all economic segments of the community. The main way a housing element accommodates lower income housing needs is through zoning ordinances that allow sufficient opportunities to construct multi-family residences. Nothing in the laws discussed in this opinion requires a local government to build, finance, or otherwise contribute public funds to construct lower income housing.

This case involves the City of Clovis's (City) housing element and related zoning ordinances and whether they comply with specific statutory requirements designed to assure affordable housing opportunities to lower income families in California. These requirements for a municipality's housing element have statewide importance because the housing elements of all cities and counties must include compliant zoning that accommodates the municipality's need for lower income housing.

*Adequacy of Housing Element*. Desiree Martinez, a Clovis resident, sued the City, alleging its housing element for the 2015-2023 planning period, including amendments and

---

[1] The quoted findings were made in 2017. (Stats. 2017, ch. 378, § 1 [adding Gov. Code, § 65589.5, subd. (a)(2)]; see *Save Lafayette v. City of Lafayette* (2022) 85 Cal.App.5th 842, 853.) But, the finding that the lack of housing is a "critical problem" was first made in 1990 and has been reenacted each time the statute has been amended. (Stats. 1990, ch. 1439, § 1 [adding Gov. Code, § 65589.5, subd. (a)(1)]; see e.g., Stats. 2005, ch. 601, § 1; Stats 2022, ch. 651, § 1.) Subsequent undesignated statutory references are to the Government Code.

2.

zoning changes adopted in March 2019, did not substantially comply with the Housing Element Law.[2] The trial court ruled in Martinez's favor, finding the City's zoning changes did not meet the statute's minimum density requirements and, therefore, did not provide enough sites to accommodate the City's affordable housing allocation. As a result, the court concluded the amended housing element did not substantially comply with state law. The court issued a peremptory writ of mandate directing the City to adopt a housing element for the 2015-2023 planning period that substantially complies with the Housing Element Law and to zone or rezone adequate sites to accommodate its unmet lower income housing allocation from the previous (fourth cycle) planning period. The City appealed, contending it had substantially complied with the Housing Element Law.

First, we conclude the trial court correctly interpreted the minimum zoning density requirement in the Housing Element Law when it found the City's zoning overlay failed to satisfy that requirement. (See § 65583.2, subd. (h) [hereafter, § 65583.2(h)].) When the sites with defective density requirements are excluded, the amended housing element did not identify sufficient sites to accommodate the City's unmet lower income housing allocation from the previous planning cycle and, therefore, did not substantially comply with the Housing Element Law. (See §§ 65583, 65583.2.) Second, we conclude the trial court misinterpreted statutory provisions addressing sites over 10 acres and nonvacant sites and, therefore, its finding that the City's analysis of those sites violated the Housing Element Law must be reversed. Despite reversal of this finding, the writ of mandate issued is otherwise affirmed because its terms are necessary to remedy the failure of the zoning overlay to comply with the Housing Element Law's density requirements.

---

[2] Further references to the "Housing Element Law" are to sections 65580 through 65589.11, which constitute article 10.6 of chapter 3 of division 1 of title 7 of the Government Code.

*Discrimination Claims*.  This appeal also addresses Martinez's claims that the City violated antidiscrimination provisions in one federal and two California statutes[3] based on a disparate impact theory.  Martinez does not seek damages for these violations or for any other violation alleged in her lawsuit.  Instead, she seeks a writ of mandate to remedy the alleged violations along with injunctive and declaratory relief.  The trial court rejected Martinez's disparate impact theory and sustained the City's demurrer to the FHA and FEHA discrimination claims without leave to amend.  The court applied similar standards for disparate impacts in rejecting the section 65008 discrimination claim on its merits.  Martinez challenged these decisions by filing a cross-appeal.  We conclude the trial court applied the wrong legal standards for pleading and proving a practice has a disparate impact and, as a result, the three discrimination claims must be remanded for further proceedings.  On a question of law not explicitly resolved in a published decision, we conclude a discrimination claim under section 65008, subdivision (b)(1)(C) may be established by proving a disparate impact on developments intended for occupancy by lower income families, even where there is no denial of a particular development.

*Duty to Affirmatively Further Fair Housing*.  After decades of failing to achieve the objective of adequate affordable housing, the Legislature significantly expanded the responsibilities of cities and counties by imposing a mandatory duty to affirmatively further fair housing.  (§ 8899.50.)  The new provision became effective on January 1, 2019, and, as a result, applies to the City's conduct in amending its housing element in March 2019.  Martinez's claim that the City violated the duty to affirmatively further fair housing was rejected by the trial court based on its conclusion that the City had not discriminated against lower income housing in violation of section 65008.  Martinez's cross-appeal challenges

---

[3]    The federal statute is the Fair Housing Act (FHA, 42 U.S.C. § 3601 et seq.).  The California statutes are section 65008 and the California Fair Employment and Housing Act (FEHA; § 12900 et seq.).

4.

this conclusion and presents questions about the recently enacted duty that has yet to be addressed by a California appellate court.

First, we interpret section 8899.50 as requiring public agencies to do more than simply refrain from housing discrimination. Thus, a trial court's finding that a city or county did not discriminate in its housing related programs and activities does not automatically mean the entity fulfilled "its obligation to affirmatively further fair housing." (§ 8899.50, subd. (b)(1).) Second, we find as a matter of law the City violated its duty to "administer its programs and activities relating to housing and community development in a manner to affirmatively further fair housing" (§ 8899.50, subd. (b)(1)) when it adopted a zoning overlay that failed to comply with density requirements imposed by the Housing Element Law.

We therefore affirm in part, reverse in part, and remand the matter for further proceedings on the three discrimination causes of action under section 65008, the FHA, and the FEHA and the cause of action alleging a violation of section 8899.50's duty to affirmatively further fair housing.

## BACKGROUND ON HOUSING ELEMENT LAW

Over fifty-seven years ago, "the California Legislature enacted a broad measure requiring all counties and cities in California to 'adopt a comprehensive, long-term general plan for the physical development of the county or city.' (Gov. Code, § 65300 et seq., enacted by Stats. 1965, ch. 1880, § 5, pp. 4334, 4336, operative Jan. 1, 1967.)" (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 444.) "Each municipality's general plan is to contain a variety of mandatory and optional elements, including a mandatory housing element consisting of standards and plans for housing sites in the municipality that 'shall endeavor to make adequate provision for the housing needs of all economic segments of the community.' " (*Ibid.*; see § 65580 [legislative findings].) The general plan often is described as the constitution for all future development within the city

5.

or county. (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 152.) All local land use decisions, including zoning ordinances, must be consistent with the general plan. (§ 65860.)

In 1980, the Legislature enacted the Housing Element Law, "a separate, comprehensive statutory scheme that substantially strengthened the requirements of the housing element component of local general plans." (*California Building Industry Assn. v. City of San Jose*, *supra*, 61 Cal.4th at p. 445.) Many components[4] of a municipality's housing element are mandatory. (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1182 (*Fonseca*).)

In broad terms, the mandatory components of a housing element include "an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing." (§ 65583.) Three specific mandatory components relevant to this appeal are the *assessment* of housing needs, the *inventory* of resources and constraints relevant to meeting those needs, and the *program* of the scheduled action the municipality is undertaking or intends to undertake during the planning period to implement the policies, goals, and objectives of the housing element. (§ 65583, subds. (a), (c).)

*Review and Revision*

A municipality must review its housing element for the appropriateness of its housing goals, objectives, and policies and must revise the housing element in accordance with a statutory schedule. (§ 65588, subds. (a), (b).) The interval between the due dates for the revised housing element is referred to as a planning period or cycle, which usually is eight

---

[4] One treatise describes "[t]he statutory requirements for the *housing element* [as] prolix and often amended." (7 Miller & Starr, California Real Estate (2022 4th ed.) § 21:5, p. 21-44.)

years.[5] (§ 65588, subds. (e)(3), (f)(1).) City's third revision of its housing element was due June 30, 2002, and its fourth revision was due June 30, 2008. (§ 65588, subd. (e)(1)(C).) City's fifth revision was due December 31, 2015, as its fifth planning period or cycle is 2015-2023. Other jurisdictions fifth cycle began in 2013, 2014, 2015, or early 2016. (Elmendorf, et al., *Making It Work: Legal Foundations for Administrative Reform of California's Housing Framework* (2020) 47 Ecology L.Q. 973, 992 (*Making It Work*).)

Before revising its housing element, a local government must make a draft available for public comment and, after comments are received, submit the draft, as revised to address the comments, to the Department of Housing and Community Development (HCD).[6] (§ 65585, subd. (b)(1); see § 65588 [review and revision of housing element by local government].) After a draft is submitted, the HCD must review it, consider any written comments from any public agency, group, or person, and make written findings as to whether the draft substantially complies with the Housing Element Law. (§ 65585, subds. (b)(3), (c), (d); *Fonseca*, *supra*, 148 Cal.App.4th at p. 1184.) Those written findings must be reported to the local government within 90 days of HCD's receipt of the draft. (§ 65585, subd. (b)(3).)

If the HCD finds the draft does not substantially comply with the Housing Element Law, the local government must either (1) change the draft to substantially comply or (2) adopt the draft without changes along with a resolution containing findings that explain its belief that the draft substantially complies with the law. (§ 65585, subd. (f).)

Promptly after adopting its revised housing element, the local government must submit a copy to the HCD. (§ 65585, subd. (g).) Within 90 days, the HCD shall review the

---

[5] The eight-year planning period was adopted in 2008. (Stats. 2008, ch. 728, § 7.) Previously, the usual planning period was five years. (See Stats. 2007, ch. 633, § 3; *Fonseca*, *supra*, 148 Cal.App.4th at p. 1183.)

[6] HCD develops and oversees housing policy in the state, including compliance with the Housing Element Law.

7.

adopted housing element and report its findings to the local government.  (§ 65585, subd. (h).)  If the HCD finds the housing element amendment substantially complies, the housing element enjoys a rebuttable presumption of validity.  (§ 65589.3.)

If the HCD finds the adopted housing element does not substantially comply with the Housing Element Law, it "shall notify" the local government and "may notify the office of the Attorney General" that the local government is in violation of state law.  (§ 65585, subd. (j).)  Similarly, the HCD shall notify the local government and may notify the Attorney General if the HCD finds certain actions or failures to act by the local government are inconsistent with the adopted housing element or do not substantially comply with the Housing Element Law or other specified provisions of the Government Code.  (§ 65585, subd. (j).)  Section 65585 also specifies procedures for an action or proceeding brought by the Attorney General to address housing element compliance.  (§ 65585, subds. (k), (*l*).)

*Assessment of Housing Needs*

A revised housing element's assessment of needs must quantify the locality's existing and projected housing needs for all income levels, which includes the locality's proportionate share of regional housing needs for each income level.  (§ 65583, subd. (a)(1).)  The projected regional housing needs for a planning period are determined by the HCD in consultation with regional "councils of government."  (§§ 65584, subds. (a) & (b), 65584.01, 65588, subd. (e)(3).)  Based on the HCD's regional housing needs determination, each regional council of governments adopts a "final regional housing need plan that allocates a share of the regional housing need" among the cities and counties within its region.  (§ 65584, subd. (b).)  City's regional housing needs allocation (RHNA) is determined by the Fresno Council of Governments (Fresno COG), which allocates the HCD's determination of regional housing need among the jurisdictions in Fresno County.

The Housing Element Law divides the units in a RHNA into four categories: very low income, low income, moderate income, and above moderate income levels. (§ 65584, subd. (f).)

To summarize, the HCD's regional housing needs determination and the RHNA assigned to a locality by the regional council of governments are the centerpiece of a revised housing element's assessment of housing needs.

*Inventory*

After receiving its RHNA, each local government must update its housing elements to identify specific sites for development within the planning period that are sufficient to accommodate its RHNA for all income levels. (§ 65583.2, subd. (a).) The revised housing element must include "[a]n inventory of land suitable and available for residential development, including vacant sites and sites having realistic and demonstrated potential for redevelopment during the planning period to meet the locality's housing need for a designated income level, and an analysis of the relationship of zoning and public facilities and services to these sites." (§ 65583, subd. (a)(3); hereafter, site inventory.) Land suitable for residential development is categorized by the type of zoning for each site and includes (1) vacant sites zoned for residential use, (2) vacant sites zoned for nonresidential use that allow residential development, (3) residentially zoned sites capable of being developed at a higher density, and (4) sites zoned for nonresidential use that can be redeveloped for residential use, provided they meet certain statutory standards. (§ 65583.2, subd. (a).)

The site inventory in a revised housing element is a listing of properties by assessor parcel number that contains information specified by statute. The mandatory information includes the size, general plan designation, and zoning of each listed property; a map showing the property's location; a general description of environmental constrains to the development of housing; and a description of existing or planned utilities, including availability and access to distribution facilities. (§ 65583.2, subd. (b)(2), (4), (5), (7).) The

9.

site inventory also "shall specify for each site the number of units that can realistically be accommodated on that site and whether the site is adequate to accommodate lower income housing, moderate-income housing, or above moderate-income housing." (§ 65583.2, subd. (c).)

For nonvacant sites, the site inventory must describe "the existing use of each property." (§ 65583.2, subd. (b)(3).) Also, for nonvacant sites, the local government "shall specify the additional development potential for each site within the planning period and shall provide an explanation of the methodology used to determine the development potential." (§ 65583.2, subd. (g)(1).)

The statute does not limit the parcel sizes, but if the parcels are smaller than a half-acre or larger than 10 acres, the locality must demonstrate development is feasible on the identified parcels. (§ 65583.2, subd. (c)(2).) To ensure the zoning density of a site is adequate to accommodate housing development to meet its RHNA for lower income households, a local government may either provide an analysis demonstrating the zoned density will accommodate this need or use a statutorily determined density. (§ 65583.2, subd. (c)(3).)

If a local government fails to identify adequate sites in the prior planning period to accommodate its RHNA for that period, the local government must "zone or rezone adequate sites to accommodate the unaccommodated portion of the regional housing need allocation from the prior planning period" (the carryover) within the first year of the new planning period.[7] (§§ 65584.09, subds. (a) & (b), 65583, subd. (c)(1).)

---

[7] The term "shortfall" is used to describe the unaccommodated portion of a local government's RHNA for a particular planning period, which becomes the next planning period's carryover. Here, the City's fourth cycle RHNA shortfall of 4,425 lower income units became its "carryover" for the fifth planning period.

*Program*

After a local government has assessed its housing needs, analyzed constraints, and compiled its site inventory, "it writes the program side of its housing element." (*Making It Work*, *supra*, 47 Ecology L.Q. at p. 995 [the program's schedule of action is the housing element's substantive heart].) If the available sites do not accommodate the local government's RHNA for each income level, the program shall identify the actions that will accommodate those needs, which include rezoning actions to close the gap. (§ 65583, subd. (c)(1); *Making It Work*, *supra*, 47 Ecology L.Q. at p. 995.) In particular, the program shall identify sites that can be developed for housing within the planning period pursuant to section 65583.2(h) and the identification shall include all components specified in section 65583.2. (§ 65583, subd. (c)(1)(B).)

Section 65583.2(h) requires an adequate sites program to accommodate 100 percent of the housing need for "very low and low-income households" and allow development of those units "by right," meaning the local government "may not require a conditional use permit, planned unit development permit, or other discretionary local government review or approval." (§ 65583.2, subds. (h) & (i).) The sites for carryover from the prior planning cycle "shall be zoned with minimum density and development standards that permit at least 16 units per site at a density of … at least 20 units per acre."[8] (§ 65583.2(h); see § 65583.2, subd. (c)(3)(B)(iii).) At least half of the sites must be designated exclusively for residential use, unless they are mixed-use sites that allow 100 percent residential use and require that

---

[8] As structured, it is possible that sentence could be read to mean that only the units per acre minimum applied to the City. However, the City's appellate briefing does not urge us to adopt such an interpretation and states that under section 65583.2(h) a municipality "must permit the development of at least 16 units for each site utilized for lower income need." This interpretation does not affect the outcome of this appeal. The City's failure to comply with the 20 units per acre density requirement is addressed in part I.C., *post*.

residential use occupy at least 50 percent of the total floor area of a mixed-use project. (*Ibid.*)

If the local government later wishes to reduce the residential density of a parcel below that contemplated in the housing element and there are inadequate sites remaining to accommodate the RHNA for that income level, a "no net loss" provision obligates the local government to quickly rezone additional sites to make up the difference. (§ 65863, subd. (c).)

*Compliance and Enforcement*

Despite the mandatory nature of many of the Housing Element Law's provisions, compliance has been mixed statewide. "As recently as 2017, some municipal officials were openly proclaiming that they had no intention of approving projects that conformed with their housing elements." (*Making It Work*, *supra*, 47 Ecology L.Q. at pp. 985–986.) Traditionally, the mechanism for getting local governments to actually implement the actions promised in their programs did not amount to much. (*Id*. at p. 995.) Due to an ever-increasing lack of affordable housing, the Legislature has amended the Housing Element Law a dozen times since 2017. One amendment, effective January 1, 2018, increased the oversight powers of the HCD.[9] Another amendment, effective January 1, 2019, imposed a

---

[9] The legislation was Assembly Bill No. 72, which amended former section 65585 to add subdivisions (i) and (j). (Stats. 2017, ch. 370, § 1, eff. Jan. 1, 2018.) The amendments: (1) require the HCD to review any action or failure to act by a jurisdiction that it determines is inconsistent with an adopted housing element, including the failure to implement any program actions; (2) allows the HCD to revoke its prior findings that an amendment to the housing element substantially complies with the Housing Element Law until the jurisdiction comes into compliance; (3) allows the HCD to consult with and receive written comments from any local government, public agency, group, or person, regarding the jurisdiction's action or failure to act when determining whether a housing element is in substantial compliance; and (4) requires the HCD to notify the jurisdiction of a violation of law and gives the HCD authority to refer a violation to the office of the Attorney General. (Former § 65585, subds. (i) & (j).)

mandatory duty to affirmatively further fair housing, which is addressed in part III.C. of this opinion.

**FACTS**

*City's RHNA*

The two RHNA's assigned to the City that are relevant to this appeal were adopted by the Fresno COG for the 2006 through 2013 RHNA projection period (fourth cycle) and for the January 1, 2013, through December 31, 2023, RHNA projection period (fifth cycle). The fifth cycle RHNA plan was adopted by the Fresno COG on July 31, 2014. That plan set forth the RHNA for Clovis and all other jurisdictions in Fresno County. Its adoption date was 17 months before the December 31, 2015 due date for the City's fifth cycle housing element.

Sometime in 2016, the City adopted the "Fresno Multi-Jurisdictional 2015-2023 Housing Element" (2015-2023 housing element).[10] It stated the City's fifth cycle RHNA totaled 6,328 housing units, which consisted of 1,160 extremely low income units, 1,161 very low income units, 1,145 low income units, 1,018 moderate income units, and 1,844 above moderate income units.

The 2015-2023 housing element also addressed the City's fourth cycle RHNA and the number of unaccommodated housing units that carried over to the fifth planning period. The City's fourth cycle RHNA had totaled 15,383 units, including 1,637 extremely low income units, 1,638 very low income units, and 2,354 low income units (i.e., a total of 5,629 lower income units). The City had met its fourth cycle RHNA for moderate income and

---

[10] City's response to a request for admission stated the 2015-2023 housing element was adopted on July 14, 2016. In contrast, the cover page of the "Fresno Multi-Jurisdictional 2015-2023 Housing Element" states it was adopted in April 2016—a date repeated in other City documents. Appendix 2B of the 2015-2023 housing element, which includes the City's action plan and carryover analysis, states: "ADOPTED MARCH 7, 2016."

13.

above moderate income units. In contrast, the City had not accommodated 4,425 units of its lower income housing RHNA of 5,629 units.[11]

The reason for the large shortfall during the fourth cycle was the City had rezoned a substantial amount of land at densities that could accommodate 4,614 lower income units, but only 717 units on sites zoned R-4 met the statutory requirements for adequate sites. For sites to satisfy the unaccommodated lower income RHNA, they must meet the statutory requirements. The sites (1) must be rezoned to permit owner-occupied and rental multi-family housing by right without discretionary review of the use or density and (2) must be zoned with a minimum density of 20 units per acre and be large enough to accommodate at least 16 units per site. (§ 65583.2(h).) Application of this density requirement is one of the issues raised in this appeal. In addition, at least 50 percent of the lower income RHNA carryover must be allowed on sites designated for exclusively residential uses. (*Ibid*.)

In addition to describing the shortfall from the fourth cycle, the 2015-2023 housing element discussed the City's progress towards accommodating that unmet need and the City's action plan, which included four programs. Program 4 specifically addressed accommodating the fifth cycle RHNA carryover of 4,425 lower income units (Program 4). It stated the City would "[p]rovide adequate zoning on at least 221 acres of land by December 31, 2016 to cover the unaccommodated need."

*HCD's Conditional Finding of Substantial Compliance*

On July 22, 2016, the HCD found the City's 2015-2023 housing element was in substantial compliance with the Housing Element Law conditioned on, and based on, among

---

[11] During the fourth planning period, 86 lower income units had been constructed, vacant sites for 401 units had been identified in the City's previous housing element, and 717 vacant sites had been rezoned to meet the program requirements. When these 1,204 lower income units were applied towards the 5,629 lower income units, the City was left with an unaccommodated fourth cycle RHNA of 4,425 lower income units.

14.

other things, the City's commitment under Program 4 to provide adequate zoning for its RHNA carryover. The City, however, failed to implement Program 4.

The consequences of this failure to implement were defined in part by a Housing Element Law amendment that became effective on January 1, 2018 (see fn. 9, *ante*) and increased local government accountability. Under the new provisions, the City was required to submit annual progress reports for 2016 and 2017 to the HCD by April 1, 2018. Addressing the obligation, the City passed resolution No. 18-49 on March 12, 2018, which summarized the steps it had taken to address housing needs in the City and purportedly affirmed "its commitment to take all reasonable efforts to achieve its RHNA and housing affordability for Clovis residents." The necessary rezoning, however, was not implemented by the City before its submission of the annual progress reports to HCD.

On May 7, 2018, the HCD sent City a letter requesting the status on the implementation of program actions. When no response was received, HCD sent a June 27, 2018 letter to the City stating its housing element compliance would be revoked if a response was not forwarded to the HCD within 30 days. The City's August 1, 2018 responsive letter outlined several proposed general plan amendments and rezoning approvals that "hopefully w[ould] bring the City into compliance in 2020."

*HCD's Interim Finding of Noncompliance*

On August 27, 2018, the HCD issued written findings that the City failed to implement the 2015-2023 housing element's Program 4 rezoning for RHNA, which brought the housing element out of substantial compliance with the Housing Element Law. The HCD invited the City to provide a written response before the HCD took any action, which would include revoking its finding that the City's 2015-2023 housing element was in substantial compliance with the Housing Element Law. The HCD explained the City's documentation did not describe actions that fully implemented Program 4; rather, the "City

15.

only described an anticipated schedule for program implementation," which did not "provide for completion of required zoning actions within a reasonable deadline extension."

On September 10, 2018, the City's planning and development services department submitted a staff report to the city council recommending two amendments to the general plan and zoning ordinance to address the unmet fourth cycle RHNA. The first proposed amendment allowed multi-family housing in the P-F (Public Facilities) zone district (the P-F Zone), which could provide over 100 acres of land to accommodate housing. The second proposed amendment created a city-wide zoning overlay that would allow multi-family housing on properties that meet specific standards. The city council accepted the recommendation and directed staff to make the amendments.

On September 21, 2018, Central California Legal Services (CCLS) sent a letter to the HCD challenging the City's housing element compliance. Among other things, the letter addressed the City's proposal to amend its general plan and zoning ordinance to allow multi-family housing in the P-F Zone. The letter identified around 30 Clovis properties currently zoned as P-F and stated their location, size, and current use. CCLS argued those uses "demonstrate how unlikely it is that any multi-family housing development will occur there," as the identified sites were occupied with other uses and it was difficult to see how any of the existing uses could be compatible with multi-family housing development.

On September 24, 2018, the City responded to the HCD, stating it had "commenced the implementation of a rezone program to address the [RHNA], which includes General Plan and Zoning Ordinance amendments." Three days later, the City's planning commission recommended that the city council (1) amend the general plan to allow for multi-family housing in the P-F Zone and (2) amend the zoning ordinance to (a) provide for multi-family housing as a permitted use in the P-F Zone and (b) add a new overlay zone district for the RHNA (the RHN Overlay).

16.

An overlay zone district is a special zone district that adds another layer of permitted uses and standards over and beyond the existing (i.e., base layer) zoning. Unlike a conventional rezoning, an overlay does not remove the zoning rights of the base layer. Thus, when an area previously zoned for single-family housing becomes subject to an overlay district for multi-family housing, both types of housing are allowed within the overlay district. In such an overlay district, multi-family housing development and single-family housing development compete for sites.

On September 28, 2018, CCLS sent the HCD a letter addressing the City's response. With respect to the proposed RHN Overlay, CCLS was concerned the City's site plan review process rose to the level of discretionary review, as it allowed the City to impose additional conditions to a development's approval, which would violate the requirement that multi-family housing be permitted by right without discretionary review. With respect to sites in the P-F Zone, CCLS argued the City had not confirmed that public entities, including a school district and flood control district, were willing or able to partner on lower income housing with density levels of 30 to 43 units per acre. Thus, CCLS asserted the City had not sufficiently quantified how it would satisfy the unmet RHNA.

On October 4, 2018, the City sent a letter to the HCD responding to CCLS's comments. The City stated it revised the mapping for the proposed RHN Overlay to contain "only vacant lands between 1 to 10 acres," which would make available "a total of 134 acres to accommodate affordable housing at a density of 35 to 43 units per acre, providing 4,690 to 5,762 units dispersed fairly evenly across City limits." The City represented there would be a rezoning project for the P-F Zone that would result in 70 acres of property feasibly counting toward the RHNA and would account for 2,450 to 3,010 units. The City also represented the zones would meet minimum coverage requirements, provide for approvals by right, and include enough units to absorb the loss of affordable housing lands as development occurs over time.

17.

On October 10, 2018, CCLS wrote the HCD to provide input concerning the City's latest letter. CCLS asserted the site plan review and building permit processes would not allow for an RHNA project to be approved by right and it was highly unlikely the identified public facility property, which was owned by California State University, Fresno (university), would be available for development of multi-family housing.

The City's October 12, 2018 letter to HCD addressed the CCLS's allegation of discretionary review by asserting the City's site plan review was ministerial but, to avoid ambiguity, that review process had been removed from the proposed RHNA program. The letter also stated the building permit process did not provide an avenue for the public to challenge an RHNA project. With respect to the university's property in the P-F Zone, the City asserted the site "could easily be developed as affordable housing in the future" and it was unnecessary for the City to have established partnerships with other landowner public entities for the sites to be included as part of the RHNA inventory.

*HCD's Revocation of Substantial Compliance and City's Responsive Action*

On October 11, 2018, HCD sent the City a letter stating the City's September 24, 2018 response did not demonstrate implementation of Program 4. Thus, the HCD notified the City it was revoking its finding that the City's 2015-2023 housing element, adopted March 7, 2016, substantially complied with the Housing Element Law.

On October 15, 2018, the city council introduced and considered amending its general plan and zoning ordinance to allow multi-family housing by right within the P-F Zone and to add the city-wide RHN Overlay allowing high density multi-family housing by right on existing residentially zoned parcels from one to 10 acres.

The staff report detailed the process that led to the proposed actions, including HCD's communications with the City and CCLS. The report analyzed the programs and noted they had "the highest probability of success," as "developers w[ould] have multiple options … to offer affordable housing options … to residents who will integrate into the

18.

community and have available services." As for the P-F Zone, the report noted the properties would be more marketable for private development if current restrictions were removed, including the need for a public hearing for approval. As for the RHN Overlay, the report noted there were "approximately 134 acres ranging from 1.0 and 10.0 acres and currently zoned residential that could reasonably accommodate multiple-family development." The two programs combined were anticipated to accommodate between 7,140 and 8,772 units.

On November 5, 2018, the City approved the proposal by adopting ordinance No. 18-26, which (1) amended Clovis Municipal Code section 9.16.020 to allow multi-family developments in the P-F Zone subject to a building permit; and (2) added Clovis Municipal Code section 9.18.050 to establish an RHN Overlay that applies to all vacant residentially zoned property within the City limits with a minimum of 1.0 and a maximum of 10.0 acres, which was intended to provide "by-right" approval for lower income housing at a density of 35 to 43 units per acre.

On November 13, 2018, CCLS sent a comment letter to HCD regarding ordinance No. 18-26, pointing out that despite the high-density levels permitted by the overlay program, the underlying zoning designations still allowed low-density development. CCLS implied the competition from the underlying low-density development was a barrier to potential development at higher densities.

On December 10, 2018, the City adopted ordinance No. 18-28, which rezoned 887 acres of land to the P-F Zone, consistent with the general plan. The City forwarded both ordinances to the HCD.

On January 10, 2019, the HCD requested a site inventory of each rezone program with specific details for each opportunity site. The City's staff assembled the data and prepared the site inventory, which consisted of spreadsheets and maps of the sites. The staff report stated that while the site analysis was being prepared, units were lost due to a number

19.

of factors: (1) two RHN Overlay sites had been approved for moderate income housing, removing them from the inventory, and other sites had improvements that caused a portion of them to be removed; and (2) several P-F Zone properties included constraints which might not be overcome during the planning period. With these adjustments, the overall count of units to address the RHNA for lower income housing carried over from the fourth cycle was 5,156 units. Of these units, 4,037 were in the RHN Overlay, and 1,119 were in the P-F Zone sites.

On March 4, 2019, the city council adopted resolution No. 19-22 to amend its 2015-2023 housing element to incorporate the site inventory for the RHN Overlay and the P-F Zone, which had been prepared at the HCD's request. The City provided HCD with links to resolution No. 19-22 and the site inventory the following day. The resolution and the site inventory were added as an appendix to the City's 2015-2023 housing element. This opinion refers to the 2015-2023 housing element and appendix as the "amended housing element." The site inventory consists of two spreadsheets that list identified sites within the RHN Overlay and P-F Zone, with detailed information about each site, as well as maps of each site within the RHN Overlay zone and P-F Zone.

On March 14, 2019, CCLS sent a letter to the HCD objecting to the rezone programs on the grounds (1) the underlying zoning for the RHN Overlay continued to allow very-low densities and (2) the university-owned property in the P-F Zone was not available for development of lower income housing because its use in agricultural education was much more valuable to the university than residential development.

*HCD's Finding of Compliance with Housing Element Law*

On March 25, 2019, HCD sent the City a letter finding the City's amended housing element complied with the Housing Element Law. The HCD noted the various documents it had received and considered, including comments from CCLS and the Public Interest Law Project. The HCD explained it found the City satisfied the requirements described in

20.

HCD's July 22, 2016, and May 7, June 27, August 27, and October 11, 2018 review letters, which required the City "to rezone to accommodate a 4th cycle planning period shortfall of sites adequately zoned to develop housing for lower-income households." Consequently, the letter stated the 2015-2023 housing element, as amended by the supplemental appendix adopted on March 4, 2019 (i.e., the amended housing element) complied with the Housing Element Law. The letter also noted that housing element compliance was an eligibility or ranking criterion for several federal and state funding programs and that "Clovis may now be eligible for these funding sources."

## PROCEEDINGS

In October 2019, Martinez and another plaintiff, Maria De Jesus Sanchez,[12] initiated this lawsuit. The first amended verified petition for writ of mandate and complaint for declaratory and injunctive relief, which is the operative pleading, alleges eight causes of action against the City, its city council, and its city manager, Luke Serpa. The first three causes of action sought a writ of mandate pursuant to Code of Civil Procedure section 1085 for violations of the Housing Element Law challenging: (1) the adequacy of the City's amended housing element; (2) the City's failure to comply with the requirement to rezone to accommodate the RHNA carryover within the first year of the fifth planning period; and (3) the City's failure to implement Program 4.

The fourth through sixth causes of action alleged (1) discrimination against lower income housing in violation of section 65008; (2) discrimination in violation of the federal FHA; and (3) discrimination in violation of FEHA. The seventh cause of action alleged a violation of section 8899.50, which became effective on January 1, 2019, and imposes a duty on public agencies like the City to affirmatively further fair housing. The eighth cause of action sought declaratory and injunctive relief.

---

[12] De Jesus Sanchez was dismissed from the case in February 2021.

21.

The petition's prayer for relief requested a writ of mandate directing the City to adopt a housing element for the 2015-2023 planning period that substantially complies with the Housing Element Law and to implement Program 4. It also requested the writ suspending the City's land use authority pursuant to section 65755.[13] The petition requested an injunction requiring the City to correct "the deficit in zoned parcels and built units for affordable housing, including but not limited to[,] incentives to affordable housing developers; an Affordable Housing Trust Fund; identification of a funding stream, such as a linkage fee, for incentives and a Trust Fund; and/or use of a corrective approval ratio for entitling low-income and higher-income housing developments." Martinez did not seek monetary damages under her discrimination claims. She requested an award of reasonable attorney fees and costs pursuant to Code of Civil Procedure section 1021.5 (California's private attorney general statute) and the FHA (42 U.S.C. § 3612(c)(2)).

*Ruling on Demurrer*

In December 2019, Martinez filed a request for a prioritized hearing date on the writ of mandate as required by section 65753.[14] The City demurred to the petition's fourth, fifth and sixth housing discrimination causes of action. Martinez filed an opposition, and the City filed a reply. In July 2020, the trial court heard argument on the demurrer and took it under advisement. On August 11, 2020, the trial court filed an order overruling the

---

[13]    Section 65755, subdivision (a) authorizes courts to (1) suspend the authority of a city or county to issue building or related permits, grant zoning changes or variances, and approval subdivision maps and (2) mandate the city or county approve certain types of residential housing, such as a residential development stymied by an invalid zoning ordinance.

[14]    Section 65753, subdivision (a) provides that a "petitioner shall request a hearing or trial on the alternative writ or peremptory writ of mandate … within 90 days of the date the petitioner files the petition for a writ of mandate pursuant to Section 65751." Within 30 days after the request is filed, the trial court is required to set a hearing or trial date. (Gov. Code, § 65753, subd. (b); cf. Pub. Resources Code, § 21167.4 [hearing request, briefing schedule, and hearing date in environmental cases].)

demurrer to the fourth cause of action for discrimination against lower income housing and sustaining the demurrer to the fifth and sixth causes of action for discrimination against people of color without leave to amend.

*Writ of Mandate Hearing and Order*

In September 2020, Martinez filed a memorandum of points and authorities, along with supporting declarations and exhibits and a request for judicial notice, addressing the first, second, third, fourth, and seventh causes of action, and seeking issuance of a writ of mandate on those claims. Martinez did not address the merits of the eighth cause of action for declaratory and injunctive relief, stating she would pursue it by separate motion.

The City filed a memorandum of points and authorities in opposition to Martinez's request for writ relief. The City specifically addressed the first through fourth causes of action, but did not address the seventh cause of action alleging a violation of section 8899.50's duty to affirmatively further fair housing. The City also filed a declaration with attached exhibits, a request for judicial notice, and objections to Martinez's evidence, as well as a supplemental declaration with exhibits. Martinez filed a reply brief, along with objections to the declaration the City offered, responses to the City's objections to her evidence, and a supplemental request for judicial notice.

At the hearing on February 19, 2021, the trial court heard counsel's arguments; no testimony or other evidence was introduced. The court took the matter under submission and, on April 30, 2021, issued a written statement of decision and order granting the petition for writ of mandate in part. The writ was granted as to the first through third causes of action and denied as to the fourth and seventh causes of action. The trial court acknowledged that the eighth cause of action for declaratory and injunctive relief remained undecided. The trial court ordered that (1) judgment be entered in Martinez's favor on the first, second and third causes of action and (2) a peremptory writ of mandate issue directing the City to (a) adopt a housing element for the 2015-2023 planning period that substantially

23.

complies with section 65754; and (b) to implement Program 4 by zoning or rezoning an adequate number of sites to accommodate the City's unmet share of the RHNA from the 2008-2013 planning period.

Martinez prepared a proposed judgment for writ of mandate as described in the trial court's order. The City filed objections to the proposed judgment, asking the trial court to dismiss the eighth cause of action on its own motion and enter a final judgment. Martinez filed a written response, asserting the eighth cause of action was neither resolved nor abandoned and it should remain pending so she could pursue the remedy provided by section 65755 (i.e., the suspension of the City's land use authority) should the City fail to comply with the writ of mandate.

On June 1, 2021, the trial court signed and filed the proposed judgment without modification. A week later, the clerk of the superior court executed the peremptory writ of mandate containing the terms described above and directing the City to file a return within 150 days stating how it had complied with the writ. The City filed a timely appeal and Martinez filed a timely cross-appeal.

## DISCUSSION

I.      THE CITY'S APPEAL

The City contends the trial court erred in issuing a peremptory writ of mandate. The writ was issued based on the court's finding the City's amended housing element did not comply with the requirements of the Housing Element Law in two respects: (1) the minimum density on the RHN Overlay sites was less than 20 units per acre as required by section 65583.2(h); and (2) the City did not provide the analysis required for P-F Zone sites that were either larger than 10 acres or had an existing use. The City contends these findings are not supported by the law and are contrary to the HCD's position. The City argues that upholding the trial court's decision "will severely compromise efforts both locally and statewide to provide sites for the development of lower-income housing."

24.

*A.    Appealability*

As a threshold issue, we consider Martinez's claim that the appeal must be dismissed because the judgment is not yet final under the one final judgment rule.

"An appealable judgment is a jurisdictional prerequisite to an appeal.  [Citation.] Under the 'one final judgment' rule, an order or judgment that fails to dispose of all claims between the litigants is not appealable.  [Citations.]  The rule precludes appeal of an order granting or denying a writ of mandate if other causes of action remain pending between the parties, even if the causes disposed of by the judgment were tried separately or may be characterized as 'separate and independent' from those remaining." (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 587.)

Here, the City appealed from the June 1, 2021 judgment finding in Martinez's favor on the first, second and third causes of action alleged in the petition and ordering issuance of a peremptory writ of mandate.  The statement of decision shows the trial court (1) found against Martinez on her fourth and seventh causes of action, (2) sustained the City's demurrer to her fifth and sixth causes of action, and (3) did not decide the eighth cause of action for injunctive and declaratory relief under Code of Civil Procedure sections 526 and 1060[15] because Martinez did not address that cause of action in her motion.  Martinez explained why she did not do so—because she sought the writ of mandate under the priority setting for claims alleging an inadequate housing element required in section 65753, which left the eighth cause of action for declaratory relief that she intended to pursue by separate motion.  Martinez argues because the judgment did not dispose of all the claims between

---

[15]    Martinez sought a declaration that:  (1) the City failed to zone or rezone adequate sites to accommodate the City's unmet housing need from the prior planning period as required by section 65584.09; (2) the 2019 revised housing element failed to comply with state law; (3) the City failed to implement Program 4 of the City's housing element; and (4) the City's failure to comply with their legal obligations has an unlawful discriminatory effect on Martinez and therefore violates Government Code sections 65008 and 12900 et seq., and 42 United States Code section 3601 et seq.

herself and the City, the judgment is not appealable and both the appeal and cross-appeal therefore must be dismissed.

We conclude the appeal should not be dismissed, as we elect to exercise our discretion to treat the appeal as a petition for writ of mandate and review the matter. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 732 [appellate court may exercise its discretion to construe an appeal as a petition for writ of mandate in unusual circumstances where doing so would serve the interest of justice and judicial economy]; *Daugherty v. City and County of San Francisco* (2018) 24 Cal.App.5th 928, 943–944.) In our view, the interests of justice and judicial economy would not be served by deferring resolution of this appeal, which the parties have fully briefed. Moreover, if not reviewable, the City would be required to comply with the peremptory writ of mandate while awaiting the final resolution of the claim for declaratory and injunctive relief, which Martinez asserted below was left unresolved only so she could seek further relief should the City fail to comply with the peremptory writ of mandate. Under these circumstances, treatment as a writ petition is warranted.[16]

### B.     Standard of Review

"[A]ny interested party" may challenge a local government's housing element by a traditional mandamus action filed in the superior court under Code of Civil Procedure section 1085. (§ 65587, subd. (b); see § 65583, subd. (h).) In an action to determine whether a housing element complied with the requirements of the Housing Element Law, the court's review "shall extend to whether the housing element … *substantially complies*

---

[16]     We recognize the superior court, which would properly be a respondent in a writ proceeding, is not before us. Realistically, however, that court would be only a nominal party and likely would not make an appearance. We do not find its absence presents an impediment to proceeding with this action as though on a writ. (*Olson v. Cory* (1983) 35 Cal.3d 390, 401 [superior court's absence in appeal treated as writ proceeding did not present an "insuperable obstacle since there [was] no indication that the court … would … become more than a nominal party"].)

with the requirements" of the law. (§ 65587, subd. (b), italics added.) Courts have defined substantial compliance as " 'actual compliance in respect to the substance essential to every reasonable objective of the statute,' as distinguished from 'mere technical imperfections of form.' " (Camp v. Board of Supervisors (1981) 123 Cal.App.3d 334, 348; accord, Fonseca, supra, 148 Cal.App.4th at p. 1185.) Such a review is limited to whether the housing element satisfies the statutory requirements, "not to reach the merits of the element or to interfere with the exercise of the locality's discretion in making substantive determinations and conclusions about local housing issues, needs, and concerns." (Fonseca, supra, at p. 1185.)

Appellate courts "independently ascertain as a question of law whether the housing element at issue substantially complies with the requirements of the Housing Element Law," using the same standard as the trial court, without giving deference to the trial court's conclusions. (Fonseca, supra, 148 Cal.App.4th at p. 1191.) "The burden is on the challenger to demonstrate that the housing element … is inadequate." (Ibid.) "If the municipality has substantially complied with statutory requirements, we will not interfere with its legislative action, unless that action was arbitrary, capricious, or entirely lacking in evidentiary support." (Ibid.) Our review is limited to "independently determining whether the housing element at issue is in substantial compliance with applicable statutory requirements, i.e., does it contain the elements mandated by the statute." (Id. at pp. 1191–1192.)

C.      The RHN Overlay

Program 4 in the 2015-2023 housing element stated the City would rezone to accommodate its fourth cycle RHNA shortfall of 4,425 lower income units by December 31, 2016. The City failed to meet this deadline, and the HCD revoked its finding the 2015-2023 housing element substantially complied with state law.

In November 2018, the City attempted to bring the 2015-2023 housing element into compliance by adopting the RHN Overlay to provide by-right approval for multi-family housing at a density of 35 to 43 units per acre on any residentially zoned property within the City limits with a minimum of 1.0 acres and a maximum of 10.0 acres. However, the base zoning in existence when the overlay was enacted still applies to the RHN Overlay sites and permits development at densities below 20 units per acre on all except one of the sites, with some densities as low as 0.5 units per acre. Martinez contends the overlapping density provisions applicable to the RHN Overlay sites do not comply with the Housing Element Law.

The parties' dispute over whether the RHN Overlay with by-right approval for housing in areas previously zoned to allow only single-family housing satisfies the Housing Element Law's density requirements raises issues of statutory interpretation. The parties have cited, and we have located, no published appellate decision addressing whether the dual density limits on the RHN Overlay sites comply with the Housing Element Law.

The parties agree that when a local government is required to rezone sites to accommodate a carryover from the prior planning period, the rezoning program must comply with section 65583.2(h). As described earlier, that subdivision imposes requirements the rezoning program must satisfy, including a density limit, which provides: "These sites shall be zoned with minimum density and development standards that permit … at least 16 units per site at a density of at least 16 units per acre in [certain] jurisdictions …, shall be at least 20 units per acre in jurisdictions [such as the City] … and shall meet the standards set forth in subparagraph (B) of paragraph (5) of subdivision (b)." (§ 65583.2(h).)

The parties disagree on the interpretation of this provision. The City contends it does not require exclusive zoning at a density of 20 units per acre; rather, it is sufficient if the RHN Overlay provides for a minimum density of at least 20 units per acre and the existence of a separate base zoning district is irrelevant to whether the overlay satisfies the density

28.

requirement. Martinez contends the provision's plain language mandates rezoned sites have a single minimum density of at least 20 units per acre, which the RHN Overlay failed to do because it did not replace the low-density allowed by the base zoning with a mandatory density of at least 20 units per acre.

### 1. Principles of Statutory Interpretation

Our interpretation of section 65583.2(h) is guided by well-established legal principles governing the interpretation of statutes. (E.g., *Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 924.) A court's role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Ibid.*) Courts look first at the words themselves, giving them their usual and ordinary meaning because statutory language is generally the most reliable indicator of that intent, having successfully braved the legislative gauntlet. (*Ibid.*; *LGCY Power, LLC v. Superior Court* (2022) 75 Cal.App.5th 844, 860–861) When examining a statute's words and inquiring into their usual and ordinary meaning, the threshold legal question is whether those words are ambiguous. (*Cavey v. Tualla* (2021) 69 Cal.App.5th 310, 336.)

"When the statutory language, standing alone, is clear and unambiguous—that is, has only one reasonable construction—courts usually adopt the plain or literal meaning of that language. [Citations.] [¶] The plain meaning of the words of a statute may be disregarded only when the application of their literal meaning would (1) produce absurd consequences that the Legislature clearly did not intend or (2) frustrate the manifest purposes that appear from [the statute's] provisions … when considered as a whole in light of its legislative history." (*Merced Irrigation Dist. v. Superior Court, supra,* 7 Cal.App.5th at p. 924.)

In comparison, when the statutory language is ambiguous, a court's primary goal is to adopt the interpretation that best effectuates the legislative intent or purpose. (*Cavey v. Tualla*, *supra*, 69 Cal.App.5th at p. 337.) To identify a statute's purpose and the underlying legislative intent, courts may look to such aids as legislative history, the maxims of statutory

construction, and the consequences of a particular interpretation, including its impact on public policy. (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)

### 2. Interpretation of Section 65583.2(h)

At the center of the parties' dispute about the meaning the density requirement is the phrases "*shall* be zoned with minimum density and development standards that permit … at least 16 units per site at a density of at least 16 units per acre in [certain] jurisdictions … [and] *shall* be at least 20 units per acre in jurisdictions" such as Clovis. (§ 65583.2(h), italics added; see § 14 [shall is mandatory].) As applicable to Clovis, the statute's language plainly requires zoning of these sites at a minimum density of at least 20 units per acre. The word "minimum" is not reasonably susceptible to more than one interpretation. It means "[t]he least quantity assignable, admissible or possible in a given case and is opposed to maximum." (Black's Law Dict. (6th ed. 1990) p. 995.) Consequently, the term "minimum density and development standards" is not susceptible to multiple interpretations and means what it says—that the sites must be zoned with at least a density of 20 units per acre. As drafted, the RHN Overlay merely allows an additional possible density and does not impose a minimum density of "at least of 20 units per acre." (§ 65583.2(h).)

Focusing on the word "permit," the City argues it is sufficient if a density of 20 units per acre is allowed on the sites through the RHN Overlay even though the base zoning allows for development at a lower density. But the word "permit" cannot be read in isolation; rather, it is constrained by the phrase "minimum density and development standards" and the minimum density standard "shall be at least 20 units per acre." (§ 65583.2(h).) Here, the base zoning allows for development at a lower density and, thus, the RHN Overlay sites do not comply with section 65583.2(h).

The City also contends section 65583.2(h) must be read in conjunction with section 65583.2, subdivision (a)(3), which provides that a jurisdiction's "inventory of land suitable for residential development," which is "used to identify sites throughout the

30.

community … that can be developed for housing within the planning period and that are sufficient to provide for the jurisdiction's share of the regional housing need for all income levels," includes "[r]esidentially zoned sites that are capable of being developed at a higher density" and which "meet the standards set forth in subdivisions (c) and (g)." The City asserts "[t]his language clearly allows the use of an overlay zone to reach the required higher density so long as the site 'is capable of being developed at a higher density' and 'meet(s) the standards set forth in subdivisions (c) and (g)." The City reasons the RHN Overlay does just that because the RHN Overlay sites are capable of being developed at the higher density required by the RHN Overlay. The City further asserts section 65583.2(h) does not limit what constitutes "land suitable for residential development" for purposes of section 65583.2, subdivision (a)(3).

The City, however, misapprehends the statutory scheme. Section 65583.2, subdivision (a)(3) applies to the identification of developable sites to accommodate a jurisdiction's share of the RHNA, which includes "[r]esidentially zoned sites that are capable of being developed at a higher density." For jurisdictions such as Clovis, "sites allowing at least 20 units per acre" are "deemed appropriate to accommodate housing for lower income households." (§ 65583.2, subd. (c)(3)(B)(iii).) But if the jurisdiction is unable to identify adequate sites to accommodate its current planning period's RHNA for lower income households or if there is a carryover of such sites from the prior planning period, then the jurisdiction must include a program in its housing element that identifies developable sites that complies with section 65583.2(h) and includes all the components specified in section 65583.2. (§§ 65584.09, subd. (a), 65583, subd. (c)(1).)

Section 65583.2(h) places more exacting zoning standards on sites being used to accommodate a carryover than are placed on the sites that are already residentially zoned and capable of being developed at a higher density. It does so by requiring the sites identified to accommodate a carryover to be zoned at specified minimum densities of at

31.

least 16 units per site and at least 20 units per acre, and to allow development by right without discretionary review. While the identification of these sites must "include all components specified in Section 65583.2" (§ 65583, subd. (c)(1)(B)), that does not mean the minimum density specified in section 65583.2(h) is supplanted by section 65583.2, subdivision (a)(3)'s allowance for "[r]esidentially zoned sites that are capable of being developed at a higher density." Rather, it requires inclusion of the components specified in section 65583.2. Thus, contrary to the City's assertion, Martinez's interpretation does not lead to disharmony, but rather gives effect to both subdivision (a) and subdivision (h) of section 65583.2. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 ["all parts of a statute should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others"].)

The City also contends this interpretation is in "disharmony" with California's no net loss statute. That statute, section 65863, requires a jurisdiction to ensure its housing element inventory or program can accommodate its remaining unmet share of the RHNA throughout the planning period and prohibits a jurisdiction from causing its inventory of sites to be insufficient to meet its remaining unmet share of the RHNA for lower and moderate-income households. (§ 65863, subd. (a).) If a jurisdiction wishes to reduce the residential density for a parcel or allow development at a lower residential density, and the remaining sites in the housing element are inadequate to meet the requirements of section 65583.2 and accommodate the jurisdiction's RHNA, the jurisdiction must identify and zone an available replacement site so there is "no net loss of residential unit capacity." (§ 65863, subd. (c)(1).) If a jurisdiction approves a development project that results in fewer units by income category than identified in its housing element for the parcel and the remaining sites in the housing element are inadequate to accommodate the jurisdiction's share of the RHNA by income level, the jurisdiction has 180 days to identify and make available additional

adequate sites to accommodate the jurisdiction's share of RHNA by income level. (§ 65863, subd. (c)(2).)

By its terms, the no net loss statute contemplates what should occur if future development activity renders a jurisdiction unable to accommodate its share of the RHNA by income level. This has no impact on the requirements of section 65583.2(h). The City asserts that if Martinez's interpretation of section 65583.2(h) is correct, the no net loss statute would specifically prohibit reduction of residential density of a site added during a "mid-cycle RHNA approval." The interpretation adopted by Martinez and this court, however, does not necessarily imply such a prohibition. While section 65583.2(h) requires a jurisdiction to zone at a minimum density of 20 units per acre to accommodate a shortfall for lower income housing, there is nothing prohibiting the jurisdiction from later rezoning those sites to a lower density if it identifies other sites that are adequate to accommodate the jurisdiction's RHNA by income level as required by the no net loss statute. Rather than creating disharmony, the no net loss statute gives the City the flexibility it claims it is being deprived of by the minimum density requirement of section 65583.2(h).

The City points out there is no explicit prohibition on the use of an overlay under section 65583.2(h). This is a weak argument because the absence of an explicit prohibition does not automatically imply that all overlays comply with all statutory requirements. Rather, the proper analysis is to identify which statutory requirements apply to the sites within the zoning overlay and then determine if those sites satisfy those requirements. Consequently, while zoning overlays are not explicitly prohibited and may be used to create sites that accommodate a portion of a RHNA carryover for lower income units, section 65583.2(h) limits the parameters of the base and overlay by requiring the site to be zoned for a minimum density.

The City argues the Legislature could not have intended to prohibit underlying densities lower than 20 units per acre because section 65583.2(h) also allows rezoned sites

33.

to include mixed-use development. The City reasons this is no different than a site with a base zone that allows development at a lower density range and an overlay zone that authorizes higher density development. But as Martinez points out, allowing mixed-use development does not negate the requirement that the site be zoned for a minimum density of 20 residential units per acre, as all residential development permitted on the rezoned sites must meet the minimum density requirements. Section 65583.2(h)'s requirement that at least 50 percent of the very low and low income housing need be accommodated on sites designated for exclusively residential uses, and the exception for sites designated as mixed use when those sites allow 100 percent residential use and require residential use to occupy 50 percent of the total floor area of a mixed-use project, are in addition to the minimum density and development standards set forth in the prior sentence.

We recognize the HCD found the City's use of the RHN Overlay to accommodate the shortfall from the prior planning period complied with the Housing Element Law, thereby creating a rebuttable presumption of the validity of the RHN Overlay. (§ 65589.3.) A rebuttable presumption, however, merely shifts the burden of proof to show the presumption is not correct. (*West Washington Properties, LLC v. Department of Transportation* (2012) 210 Cal.App.4th 1136, 1143–1144.) Martinez's interpretation of section 65583.2(h), which we adopt, effectively rebuts the presumption of validity. Put another way, courts generally will not depart from the HCD's determination unless "it is clearly erroneous or unauthorized." (*Hoffmaster v. City of San Diego* (1997) 55 Cal.App.4th 1098, 1113, fn. 13; *Kern v. County of Imperial* (1990) 226 Cal.App.3d 391, 398.) Here, given the language of section 65583.2(h), the HCD's approval of the RHN Overlay was clearly erroneous.

While the City urges us to defer to the HCD's interpretation of the statute, other than the HCD's bare approval of the RHN Overlay, there is nothing to explain the HCD's rationale for finding the overlay complies with the Housing Element Law. The City did not

34.

provide any HCD guidance concerning the use of overlays when accommodating a carryover under section 65583.2(h), and the HCD's informal interpretation of statutory requirements is not binding on us. (*Fonseca*, *supra*, 148 Cal.App.4th at p. 1193.) Thus, any deference that might be due the HCD's interpretation is overcome by the plain meaning of section 65583.2(h)'s text. (See *Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 178 ["ultimate responsibility for statutory interpretation rests with the courts"]; *Sustainability, Parks, Recycling & Wildlife Defense Fund v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 676, 701 [given plain language of statute, no deference to agency's interpretation required].)

The City contends prohibiting a local government from using an overlay to satisfy the requirements of section 65583.2(h) would lead to absurd results. (See *Merced Irrigation Dist. v. Superior Court*, *supra*, 7 Cal.App.5th at p. 924 [plain meaning of statute's language may be disregarded if produces absurd consequences].) First, the City asserts it does not make sense to allow a local government to use an overlay to satisfy its RHNA obligation when completing the inventory of sites and deprive the local government of using that tool to comply with the Housing Element Law. But as Martinez points out, there are many types of sites the Legislature has either deemed infeasible to support lower income housing or that require additional evidence of their feasibility or by-right development approvals before being deemed adequate to accommodate such housing. (See, e.g., § 65583.2, subd. (c)(2)(A) & (B) [restrictions on land inventory sites when they are very small or large]; *id.*, subd. (c) [restriction on reuse of land inventory sites from prior planning periods]; *id.*, subd. (g)(2) [when a city relies on over 50 percent of the inventory to be accommodated on nonvacant sites].) The goal is not just to identify land, but to pinpoint sites that are adequate and realistically available for residential development targets for each income level. (§ 65583, subd. (c)(1).)

The City also asserts the Legislature could not have intended to impose a minimum density for shortfalls or carryovers to provide certainty for development of lower income housing because zoning is always subject to change and if the base zoning were removed to correct a shortfall, that zoning could simply be added back at the beginning of the next planning cycle.  The City claims its only obligation is to identify sites that show sufficient capacity to accommodate housing at various income levels and "all that matters" is that the RHN Overlay sites "are capable of being developed at a higher density and the approval is by-right."  But section 65583.2(h) does not require only by-right approval when there is a shortfall or carryover; rather, it also requires minimum size and density of the rezoned parcels.  In imposing these requirements, the statute creates greater likelihood that development of adequate sites for lower income housing will occur.

In sum, section 65583.2(h) clearly imposes a minimum density requirement when a jurisdiction is required to rezone sites to accommodate a shortfall for the current planning period or the carryover from the prior planning period.  While the RHN Overlay complies with this minimum density requirement, the base zoning does not.  Because development may occur at a density that is lower than the statutory minimum, the RHN Overlay sites do not comply with section 65583.2(h).  Therefore, the ordinance that created the RHN Overlay does not substantially comply with the Housing Element Law.

Because section 65583.2(h)'s language is unambiguous, there is no need to consider the legislative history or declaration of Cathy Creswell, an independent consultant on affordable housing issues who worked for the HCD, that Martinez submitted with her moving papers on the petition.  (*Housing Partners I, Inc. v. Duncan* (2012) 206 Cal.App.4th 1335, 1346 [legislative history unnecessary to resolve appeal where the statutory language is not ambiguous].)  Although Creswell opined the RHN Overlay did not meet the requirements of section 65583.2(h) and primarily offered her interpretation of the statutory scheme, which the trial court did not find necessary or helpful, the trial court overruled the

36.

City's objections to the admissibility of the declaration but noted it did not rely on the declaration.

The City's contention that the admission of Creswell's declaration was erroneous does not identify a reversible error because the trial court explicitly stated it did not rely on the declaration. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellant has the burden of affirmatively demonstrating prejudicial error].) Furthermore, the admission of Creswell's declaration has not influenced our de novo review of section 65583.2(h)'s meaning and its application to the facts of this case because we gave no weight to the declaration.

### D.     The P-F Zone Sites

In addition to the RHN Overlay sites, the City attempted to provide sites to accommodate its RHNA carryover by amending its zoning ordinance to allow multi-family development in the P-F Zone. The City selected six sites in the P-F Zone for inclusion in the site inventory incorporated into its amended housing element by the ordinance adopted on March 4, 2019.[17] The site inventory lists four parcels as vacant, including 14.2-acre parcel with 6.8 developable acres (site No. 1). The two parcels with existing uses are a 70.05-acre parcel used for agriculture, 10 acres of which are developable (site No. 3) and a 9.4-acre parcel used as temporary parking with 2.3 developable acres (site No. 8).

The trial court found the City did not provide the analysis required to allow the P-F Zone sites to accommodate the RHNA. First, for sites over 10 acres included in the inventory, the court concluded City did not provide the analysis required by section

---

[17]     As the City points out, the trial court incorrectly stated there were eight P-F Zone sites, three of which were over 10 acres. The "P-F Overlay Site Inventory" dated March 4, 2019, lists six parcels, two of which are over 10 acres. The trial court also stated the amended housing element did not indicate whether these sites were vacant, but the site inventory clearly identifies the existing use of each property, including listing four as vacant.

65583.2, subdivision (c)(2)(B). In particular, the court found the amended housing element contained no analysis of whether P-F Zone site Nos. 1 and 3 would be subdivided or how the City would facilitate development on a portion of the site. Second, the court stated the amended housing element did not "indicate whether any of [the P-F Zone] sites are vacant or present the corresponding analysis to demonstrate that a non-vacant site could be developed during the planning period." As a result, the court concluded the amended housing element did not satisfy the requirements of section 65583.2, subdivision (g).

### 1. Sites Over 10 Acres

A jurisdiction's inventory of land is required to include the information specified in section 65583.2, subdivision (b). If a site is larger than 10 acres, the locality must either (1) demonstrate sites of equivalent size and number of lower income housing units were successfully developed during the prior planning period or (2) provide other evidence to the HCD that the site can be developed as lower income housing. (§ 65583.2, subd. (c)(2)(B).) The term "site" is defined as "that portion of a parcel or parcels designated to accommodate lower income housing." (§ 65583.2, subd. (c)(2)(B).)

The City contends the trial court erred in concluding sites greater than 10 acres were included in the P-F Zone inventory. The City asserts that because the portion of each parcel that is designated for lower income housing is 10 acres or less, section 65583.2, subdivision (c)(2)(B) does not apply. We agree with this contention. The parcels labeled site Nos. 1 and 3 are 14.2 and 70.05 acres, respectively, and the inventory states the developable acres are 6.8 and 10, respectively. The statute plainly defines "site" as the *portion* of a parcel designated to accommodate lower income housing. (§ 65583.2, subd. (c)(2)(B).) Applying this definition to the information about the developable acres provided in the inventory, we conclude none of the six parcels listed contain a "site" over 10 acres. As a result, the requirement for information about the feasibility of developing a site larger than 10 acres

does not apply, and the trial court erred in determining the City had violated section 65583.2, subdivision (c)(2)(B).

Martinez asserts the City nevertheless was required to demonstrate the feasibility of development on these sites, which it failed to do as the amended housing element lacks information to determine how development would occur on a portion of a large unsubdivided parcel. Martinez, however, does not cite any statutory authority requiring such a demonstration. Rather, she sites to a memorandum the HCD issued on June 10, 2020, that is not part of the appellate record.[18] Accordingly, we agree with the City that the trial court erred in finding the City was required to provide an analysis of the feasibility of development under section 65583.2, subdivision (c)(2)(B).

### 2.  *Statutory Requirements for Nonvacant Sites*

When a housing element's inventory of land lists nonvacant sites, the inventory shall include "a description of the existing use of each property."  (§ 65583.2, subd. (b)(3).)  An additional requirement for nonvacant sites is set forth in subdivision (g)(1) of section 65583.2, which provides that "the city or county *shall specify* the additional development potential for each site within the planning period and *shall provide* an explanation of the methodology used to determine the development potential."  (§ 65583.2, subd. (g)(1), italics added.)  The methodology used is subject to the following requirement:

> "The methodology *shall consider* factors including the extent to which existing uses may constitute an impediment to additional residential development, the city's or county's past experience with converting existing uses to higher density residential development, the current market demand for the existing use, an analysis of any existing leases or other contracts that would perpetuate the existing use or prevent redevelopment of the site for additional residential development, development trends, market conditions, and regulatory or other incentives or standards to encourage additional

---

[18]  The City's attorney referred to this memorandum during oral argument on the petition in the trial court, but the court stated that if it was not in the record, it could not consider it.  Martinez's attorney acknowledged the memorandum was not in the record.

residential development on these sites." (§ 65583.2, subd. (g)(1), italics added.)[19]

The City contends the trial court erred in its analysis of what the City was required to demonstrate for the two nonvacant sites listed in the P-F Zone inventory. The City asserts *the record* demonstrates all the relevant factors identified in subdivision (g)(1) of section 65583.2 were addressed by it and considered by the HCD when the HCD recertified the amended housing element. The City argues the HCD's finding is presumed valid and Martinez did not rebut the finding.

Under Martinez's interpretation of section 65583.2, subdivision (g)(1), the amended housing element *itself* must set forth the methodology used to determine each nonvacant site's development potential and that methodology must include an analysis of the factors listed in the statute. Martinez contends these statutory requirements were not met because no methodology was included in the amended housing element and none of the factors listed in the statute were analyzed for the nonvacant site No. 3 and site No. 8.

The parties' conflicting interpretations of section 65583.2, subdivision (g)(1) raise the following legal question: Does the statute require the City "specify the additional development potential for each [nonvacant] site within the planning period and … provide an explanation of the methodology used to determine the development potential" in the housing element itself? (§ 65583.2, subd. (g)(1).) Stated another way, may that information be specified and provided in separate documents?

---

**19** If the nonvacant sites are being used to accommodate 50 percent or more of the housing need for lower income households, the methodology also must demonstrate the existing use will not impede additional residential development. (§ 65583.2, subd. (g)(2).) The City contends this paragraph does not apply because the nonvacant sites account for less than 50 percent, or 430, of the 1,119 total units in the P-F Zone. Martinez does not contest this point.

First, we consider the words of the statute and whether those words provide an explicit answer. The statute's words do not explicitly address *where* a city or county must specify the required information or explain the methodology used.

Second, we consider the wording of subdivision (g)(1) of section 65583.2 and whether the absence of an explicit answer renders that provision ambiguous—that is, reasonably susceptible to more than one interpretation. (*Merced Irrigation Dist. v. Superior Court*, *supra*, 7 Cal.App.5th at p. 926.) One way to resolve this issue would be to conclude the wording is not ambiguous because (1) a literal reading does not require the information to be included in the housing element and (2) such a requirement should not be inserted by inference. This approach is supported by Code of Civil Procedure section 1858, which provides that "the office of the Judge is simply to ascertain and declare what is in terms or in substance contained [in a statute], not to insert what has been omitted, or to omit what has been inserted." This approach also is supported by subdivision (b) of section 65583.2, which explicitly identifies what "[t]he inventory of land shall include" and demonstrates the Legislature knew how to express an intention that information be provided in a particular document. (See generally, *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 465 [another statutory provision demonstrated the Legislature knew how to write a particular limitation that had been omitted from in the provision in question].)

Martinez's arguments about what subdivision (g)(1) of section 65583.2 requires do not acknowledge that the words used do not state the information must be contained in the housing element. As a result, Martinez has not presented grounds for rejecting a literal interpretation and inserting a requirement that the Legislature omitted. First, she has presented no legislative history supporting her interpretation. Second, she has not referred to other provisions in the Housing Element Law to support her position that the Legislature intended the required information to be set forth in the housing element. Third, she has not

41.

referred to the general purpose of the Housing Element Law and explained how her interpretation "best effectuates the purpose of th[at] law." (*Merced Irrigation Dist. v. Superior Court*, *supra*, 7 Cal.App.5th at p. 938.) Fourth, Martinez has not acknowledged the HCD's implied rejection of her interpretation when it recertified the amended housing element without directing the City to include the information in the housing element.

Consequently, based on the record and arguments presented, we conclude subdivision (g)(1) of section 65583.2 does not mandate the City "specify the additional development potential for each [nonvacant] site within the planning period and … provide an explanation of the methodology used to determine the development potential" in the housing element itself. We will not insert a requirement omitted by the Legislature. (Code Civ. Proc., § 1858.)

> 3.      *Substantial Compliance Regarding Development Potential*

Having construed the statute, our next step addresses whether the City substantially complied with section 65583.2, subdivision (g)(1)'s requirements for providing information about the development potential of the two nonvacant sites.

Site No. 3 is located east of Willow Avenue, south of Bullard Avenue, and west of Highway 168. The P-F Overlay Site Inventory describes the parcel as a 70.05-acre agricultural property with 10 developable acres that have a total realistic development potential of 350 lower income units. It also states the site has "access," infrastructure to both Bullard and Willow Avenues, no environmental constraints, and it is available in the planning period. The City contends the developability of a 10-acre portion of the site is obvious and refers to the site inventory map showing bordering parcels used for residential housing. In addition, the City relies on correspondence sent to HCD by it and CCLS that discuss the likelihood the site would be developed.

These letters show CCLS told the HCD the site is university-owned, and university staff told CCLS that the university was not interested in rezoning the site for residential

42.

purposes because the parcel was being used for agricultural education. In response, the City asserted the university needed additional student housing and in its discussions with university staff, staff was understanding and supportive of a rezone of the land to the P-F Zone. CCLS's subsequent letter to the HCD asserted the City's rezone of the land made no difference to the university, as the university was immune from the City's zoning and planning regulations and only the university's governing board could decide about the site's future development. The City responded that it was not required to make arrangements with a public entity for development of property prior to approving zoning changes to satisfy the RHNA, and while the university may not develop the site in the immediate future, the fact remained the site could easily be developed as affordable housing, which satisfied the law.

The letters show the City's efforts to assess the development potential of the site. Furthermore, HCD's March 25, 2019 letter states it considered CCLS's comments and contains (1) its finding that the City satisfied its obligation to rezone to accommodate the fourth cycle planning period shortfall of sites for lower income housing and (2) its conclusion that the City's amended housing element complied with the Housing Element Law. Thus, the HCD impliedly concluded the information provided by the City fulfilled its obligation to address the development potential of the university's 10-acre site.

Martinez contends the letters relied upon by the City do not analyze the factors that the statute requires be included in the methodology used to determine a nonvacant site's development potential. Those factors are set forth in the second sentence of section 65583.2, subdivision (g)(1) and include, among others, "any existing leases or other contracts that would perpetuate the existing use" and "regulatory or other incentives or standards to encourage additional residential development" on the site. While the City's letters did not explicitly address existing leases and contracts, it was reasonable for HCD to infer from the combined correspondence that there were no such leases or contracts. Therefore, requiring the City to explicitly state no such agreements existed would not

provide substantive information essential to the Housing Element Law's objectives and, at most, would address only a technical imperfection of form. (*Camp v. Board of Supervisors*, *supra*, 123 Cal.App.3d at p. 348.) Also, the HCD could reasonably conclude the general plan's land use designation for the site and the rezoning of the site were the regulatory standards that encouraged residential development and no other incentives or standards applied. The absence of an explicit statement about the absence of other incentives or standards was not, in our view, a substantial failure to comply with the Housing Element Law. This conclusion is not inconsistent with the approach taken in CCLS's comments. Those comments did not explicitly refer to section 65583.2, subdivision (g)(1) or assert the lack of an analysis of one or more of the statutory factors was a substantial failure to comply with the statute or prevented the HCD from determining the site's development potential. Whether the failure to raise this issue with the HCD before its decision constitutes a failure to exhaust administrative remedies is an issue beyond the scope of the parties' arguments and this opinion.

Site No. 8 is described in the P-F Overlay Site Inventory as a 9.4-acre City-owned parcel on Lind Avenue with 2.3 developable acres that has a total realistic development potential of 80 lower income units. It also states the site has infrastructure to Lind Avenue, "access," no environmental constraints, is available in the planning period, and its existing use is temporary parking. The site inventory includes a note stating site Nos. 8 and 10 are owned by Clovis and would be marketed to housing developers as potential sites for affordable housing at 35 to 43 units per acre; the sites have been identified as opportunity sites on the City's affordable housing Web page and the associated map would be used to show opportunities through other media as appropriate; if a developer expresses interest in one of these sites, the developer would make a formal offer to the City and because the use is for affordable housing, the City could sell the property without seeking competitive bids; because the City determined the properties as surplus, the City must make them available

for affordable housing before seeking other buyers; and development of these sites for purposes other than affordable housing would require replacement of zoned land per the City's affordable housing site inventory procedures.

The City asserts the current use as temporary parking is as close to vacant as possible, and there is no indication it would be difficult to prepare the site for a multi-family development project or that the current use would prevent the site from being redeveloped. As with site No. 3, the HCD's conclusion the amended housing element complied with the Housing Element law implies HCD determined the information provided by the City about site No. 8 fulfilled its obligation to address the site's development potential. To the extent that a particular statutory factor was not mentioned, Martinez has not shown how missing information was essential to the Housing Element Law's objectives—that is, was more than a technical imperfection of form. (*Camp v. Board of Supervisors*, *supra*, 123 Cal.App.3d at p. 348.)

The HCD's finding of compliance is presumptively valid and Martinez has not rebutted the finding as to the nonvacant sites. Accordingly, we reverse the trial court's finding that the amended housing element does not satisfy the requirements of section 65583.2, subdivision (g)(1) because it does not include the required analysis. First, the required information need not be included in the housing element. Second, the record adequately supports the HCD's determination that the information provided substantially complied with the statutory requirements. We note the judiciary's role does not extend to determining whether the P-F Zone sites are adequate to meet the program's objectives or to opine on what we think should be included in the program. (*Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 306 [a court looks only to ensure the statutory requirements are met, "not whether, in the court's judgment, the programs adopted are adequate to meet their objectives or are the programs which the court thinks ought to be there"].)

45.

*E. Conclusion*

Although we reverse the finding that the City did not provide the statutorily-required analysis for large or nonvacant sites in the P-F Zone, this does not require reversal or modification of the judgment in favor of Martinez on the first through third causes of action or modification of the peremptory writ of mandate. This is because the finding that the RHN Overlay does not comply with the statutory requirements, which we affirm, supports judgment in Martinez's favor on those causes of action, which allege: (1) the 2015-2023 amended housing element is inadequate because it does not include sufficient sites to accommodate the RHNA carryover for lower income housing in violation of sections 65583 and 65583.2 (first cause of action); (2) the City failed to zone for enough acreage at the required density and with adequate capacity to accommodate the RHNA carryover in violation of section 65584.09 (second cause of action); and (3) the City failed to implement Program 4 of the housing element and, prior to the judgment, had not rezoned sufficient sites to accommodate the RHNA carryover and comply with section 65583.2(h) (third cause of action).[20]

With respect to the peremptory writ of mandate, the trial court stated in the judgment it would issue a writ compelling the City to: (1) "adopt, within 120 days, a housing element for the 2015-2023 planning period that substantially complies with Government Code section 65754"; and (2) "implement Program 4, within 120 days, by zoning or rezoning an adequate number of sites, compliant with Government Code Section 65583.2(h), to accommodate the City's unmet share of the RHNA from the 2008-2013 planning period, pursuant to Government Code section 65584.09." The peremptory writ of mandate the superior court clerk issued mirrors the judgment. The court's finding that the amended

---

[20] These three causes of action overlap and could be described as counts or theories of relief, all of which were proven because the RHNA carryover was not accommodated by the amended housing element due to defective zoning densities for sites within the RHN Overlay.

housing element does not substantially comply with the Housing Element Law because the RHN Overlay does not comply with applicable density requirements supports both directives set forth in the writ. In other words, the writ does not contain provisions specific to the P-F Zone and, thus, does not need to be revised. Accordingly, while we reverse the finding concerning sites in the P-F Zone that were nonvacant or over 10 acres, we affirm the judgment.

## II.    PLEADING DISPARATE IMPACT CLAIMS UNDER THE FHA AND FEHA

Martinez's fourth through sixth causes of action alleged discrimination in violation of two California statutes (§ 65008 and FEHA) and one federal statute (FHA). Martinez did not seek monetary damages, but alleged these discrimination claims as additional grounds for the issuance of a writ of mandate and entry of declaratory and injunctive relief.

Each of Martinez's discrimination claims included allegations of intentional discrimination and discrimination based on a disparate impact, which is a specific type of discriminatory effect claim. For example, Martinez alleged the City's failure "to accommodate and to provide opportunities to develop very low- and low-income housing through its failure to comply with the Housing Element Law has an adverse and disparate impact on people of color, including African Americans, Native Americans, and Latinos." Martinez alleged the disparate impacts were predictable, statistically significant, and did not occur by chance. She alleged the City's failure "to comply with Housing Element Law also constitutes intentional discrimination" and that the City knew its failure to plan for and accommodate housing affordable to lower income households would have a disparate impact on people of color.

The trial court rejected Martinez's disparate impact theory on all the discrimination claims by sustaining the City's demurrer to her fifth (FHA) and sixth (FEHA) causes of action without leave to amend and finding her fourth cause of action (§ 65008) had not be proven. Martinez's cross-appeal challenges the adverse decision on each of the

47.

discrimination claims.  Here, we address the two causes of action eliminated at the pleading stage.

        *A.*      *General Demurrers and the Standard of Review*

A complaint must contain "[a] statement of the facts constituting the cause of action, in ordinary and concise language."  (Code Civ. Proc., § 425.10, subd. (a)(1).)  The facts pleaded must address each essential element of the cause of action; these elements are determined by the substantive law that defines the claim or theory of relief.  (*Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1018; see *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [generic elements of a cause of action are wrongdoing, causation, and harm].)

When a complaint "does not state facts sufficient to constitute a cause of action," a defendant may raise that objection by filing a demurrer.  (Code Civ. Proc., § 430.10, subd. (e).)  Determining whether a pleading alleges facts sufficient to constitute a cause of action is a question of law.  (*Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1305.)

Appellate courts independently review an order sustaining a general demurrer and make a de novo determination of whether the pleading "alleges facts sufficient to state a cause of action under any legal theory."  (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)  Generally, appellate courts "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context."  (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)  The demurrer is treated as admitting all material facts properly pleaded, but does not admit the truth of contentions, deductions or conclusions of law.  (*Ibid.*)  "To survive a demurrer, the complaint need only allege facts sufficient to state a cause of action; each evidentiary fact that might eventually form part of the plaintiff's proof need not be alleged."  (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 872.)

### B. Discrimination Under the FHA—the Fifth Cause of Action

#### 1. Basic Pleading Principles

We conclude federal law controls how to plead a disparate impact theory under the FHA. California courts recognize that federal law applies to determine the sufficiency of a complaint alleging a federal civil rights cause of action under title 42 United States Code section 1983. (*Arce v. Childrens Hospital Los Angeles* (2012) 211 Cal.App.4th 1455, 1471; *Bach v. County of Butte* (1983) 147 Cal.App.3d 554, 563.) We extend this principle to causes of action alleging a violation of title 42 United States Code section 3604(a)—that is, housing discrimination under the FHA.

The basic principles of federal law for pleading a cause of action are similar to California's. Rule 8(a) of the Federal Rules of Civil Procedure (28 U.S.C.) provides that a pleading must contain a short and plain statement of the claim showing the pleader is entitled to relief and a demand for the relief sought. A motion to dismiss may assert a "failure to state a claim upon which relief can be granted." (Fed. Rules Civ.Proc., rule 12(b)(6), 28 U.S.C.) A complaint meets federal standards if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." (*Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 570.) This facial plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Ashcroft v. Iqbal* (2009) 556 U.S. 662, 678.) Determining whether a claim is plausible is a context-specific task requiring the court to draw on its judicial experience and common sense. (*Id.* at p. 679.)

#### 2. Statutory Text Authorizing FHA Disparate Impact Claims

The FHA makes it unlawful to refuse to sell or rent, "or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." (42 U.S.C. § 3604(a).) In 2015, the United States Supreme Court

49.

interpreted this language and confirmed that disparate impact claims—a theory being pursued by Martinez—are cognizable under the FHA.  (*Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.* (2015) 576 U.S. 519, 540 (*Inclusive Communities*).)  In addition, the court stated the FHA authorizes disparate treatment claims—that is, claims alleging " 'the defendant had a discriminatory intent or motive.' "  (*Inclusive Communities*, *supra*, at p. 524.)

The textual foundation for disparate impact liability is the phrase "or otherwise make unavailable or deny" (42 U.S.C. § 3604(a)), which the United States Supreme Court stated referred "to the consequences of an action rather than the actor's intent."  (*Inclusive Communities*, *supra*, 576 U.S. at p. 534.)  Thus, a disparate impact claim can be established without proving discriminatory intent.  The court supported this statutory interpretation by concluding the recognition of disparate impact claims was consistent with the FHA's central purpose of eradicating discriminatory practices within a sector of the Nation's economy. (*Inclusive Communities*, *supra*, at p. 539; see 42 U.S.C. § 3601 [United States' fair housing policy].)

The United States Supreme Court also noted federal appellate courts had recognized disparate impact claims for several decades without creating dire consequences.  (*Inclusive Communities*, *supra*, 576 U.S. at p. 546.)  The court described the "heartland" of disparate impact claims under the FHA as "targeting artificial barriers to housing."  (*Inclusive Communities, supra,* at p. 540.)[21]

---

[21]     Commentators identify *United States v. City of Black Jack* (8th Cir. 1974) 508 F.2d 1179, as the first FHA disparate impact case where an appellate court reviewed a challenged housing barrier—specifically, a zoning ordinance that prevented the development of multi-family housing while allowing existing multi-family housing as nonconforming uses. (Note, *Statistically Speaking: Restrictive Changes to Fair Housing Act Disparate Impact Liability* (2021) 62 B.C. L.Rev. 1321, 1352, fn. 182; Seicshnaydre, *Is Disparate Impact Having an Impact? An Appellate Analysis of Forty Years of Disparate Impact Claims Under the Fair Housing Act* (2013) 63 Am. U. L.Rev. 357, 391, fn. 212 (*Forty Years*); see also Desmond, Poverty, By America (2023) pp. 114-118 and related fns.)  Based on statistics

### 3.    *Elements of an FHA Discriminatory Effects Claim*

Our determination of the pleading elements of an FHA cause of action is guided by *Inclusive Communities* and a regulation adopted by the United States Department of Housing and Urban Development (HUD) in 2013.  HUD's regulation provides a synthesis of federal decisions and addresses how liability may be established under the FHA based on a practice's discriminatory effect—that is, its disparate impact or its perpetuation of segregation.  (78 Fed.Reg. 11460-01–11482 (Feb. 15, 2013).)  The regulation was codified at former 24 Code of Federal Regulations section 100.500 (2013 Rule).  (78 Fed.Reg., *supra,* at p. 11482.)  We regard the 2013 Rule as a reliable statement of the elements of a discriminatory effects claim under the FHA because it was described without criticism by the United States Supreme Court in 2015 (*Inclusive Communities*, *supra*, 576 U.S. at pp. 527, 541–542) and, although HUD attempted to revise it during the Trump administration, the implementation of the revised rule was suspended by a district court and HUD has since proposed recodifying the 2013 Rule.  (See *Massachusetts Fair Housing Center v. United States Department of Housing and Urban Development* (D.Mass 2020) 496 F.Supp.3d 600,

---

about the racial and ethnic composition of the 99 percent white city and the composition of other jurisdictions in the St. Louis area, the Eighth Circuit reversed the district court, concluded a disparate impact claim had been established, concluded the defendant city had failed to demonstrate a reasonable justification for the zoning ordinance, and directed a permanent injunction be issued.  (*City of Black Jack*, *supra*, at p. 1188.)

"A housing barrier regulation may operate in one of several respects; to prevent the construction of housing that will likely be used by minority groups in places that currently lack minority residents; to confine housing that will be used by minority group members to neighborhoods where minority households already predominate; or to otherwise deny minority households freedom of movement in a wider housing marketplace." (*Forty Years*, *supra*, 63 Am. U. L.Rev. at pp. 360–361.)  For the period 1974 to 2013, eight of the 18 "positive FHA disparate impact decisions at the appellate level were challenges to housing barriers," which made that type of claim the most successful. (*Forty Years*, *supra*, 63 Am. U. L.Rev. at p. 402.)  The next most successful type of FHA disparate impacts decisions are "challenges to neutral occupancy rules or other restrictions on the basis of familial status." (*Ibid*.)

604–605, 611–612 [effective date 2020 rule stayed and implementation enjoined]; 86

Fed.Reg. 33590 (Jun. 25, 2021) ["the 2013 Rule better states Fair Housing Act

jurisprudence and is more consistent with the Fair Housing Act's remedial purposes"].)[22]

The 2013 Rule stated in relevant part:

"Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

"(a) Discriminatory effect. A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500.)

HUD asserts it "has always used a three-step burden-shifting approach [for disparate

impact claims], as did many federal courts of appeals prior to the 2013 Rule." (86 Fed.Reg.,

*supra,* 33590-01, 33591 (Jun. 25, 2021), fns. omitted.) Initially, the plaintiff has "the

burden of proving that a challenged practice caused or predictably will cause a

discriminatory effect." (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd.

---

**22** We recognize that federal appellate courts have split on the issue whether the United States Supreme Court implicitly adopted all the standards in the 2013 Rule or, alternatively, implicitly rejected some for more stringent tests. (Compare *Inclusive Communities Project, Incorporated v. Lincoln Property Company* (5th Cir. 2019) 920 F.3d 890, 902 [Supreme Court undoubtedly announced a more demanding test than the 2013 Rule]; *Reyes v. Waples Mobile Home Park Limited Partnership* (4th Cir. 2018) 903 F.3d 415, 424, fn. 4 with *Mhany Management, Inc. v. County of Nassau* (2d Cir. 2016) 819 F.3d 581, 618 [Supreme Court implicitly adopted HUD's approach] (*Mhany*).) Two potentially different standards or safeguards adopted by the Supreme Court are a "robust causality requirement" at the prima facie stage and, when the burden has shifted to defendants, "leeway" in stating and explaining the valid interest served by the challenged practice or policy. (*Inclusive Communities*, *supra*, 576 U.S. at pp. 541, 542.) Causation and a defendant's justification for a challenged practice are discussed below. (See pts. II.B.5. & II.B.6., *post*.)

(c)(1).)  This step is referred to as the plaintiff's "prima facie showing of disparate impact." (*Inclusive Communities*, *supra*, 576 U.S. at p. 527.)  If the plaintiff makes the prima facie showing, the burden shifts to the defendant to prove a legally sufficient justification for the practice.  (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (c)(2).)  If the defendant proves sufficient justification, the burden shifts back to the plaintiff to prove the reasons justifying the practice could be served by another practice with a less discriminatory effect.  (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (c)(3).)

The 2013 Rule does not explicitly address how to plead a discriminatory effect claim. Nonetheless, it describes the elements of a prima facie showing of such a claim.  In broad terms, the elements are (1) a practice that has (2) a discriminatory effect.  The 2013 Rule and federal case law recognize there are two kinds of discriminatory effects.  The first kind, sometimes referred to as a traditional disparate impact, is a greater adverse impact on one protected group than on others.  (*Mhany*, *supra*, 819 F.3d at p. 619; *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission* (6th Cir. 2007) 508 F.3d 366, 378.)  The second kind is the " 'harm to the community generally by the perpetuation of segregation,' " which prevents interracial association.  (*Mhany*, *supra*, at p. 619; *Graoch*, *supra*, at p. 378; see Schwemm, *Segregative-Effect Claims Under the Fair Housing Act* (2017) 20 N.Y.U. J. Legis. & Pub. Pol'y 709.)  According to HUD, "perpetuation of segregation remains, as it always has been, a basis for contending that a policy has an unlawful discriminatory effect" and is distinct from disparate impact.  (86 Fed.Reg., *supra,* at p. 33595.)  We adopt Professor Schwemm's approach and use the labels "disparate impact" and "segregative effect" to describe the two types of discriminatory effect claims.  (Schwemm, *supra*, 20 N.Y.U. J. Legis. & Pub. Pol'y at p. 710.)

The 2013 rule recognizes that a disparate impact claim can challenge a practice that "actually … results in a disparate impact" on a group of persons because of a protected characteristic.  (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (a).)

Alternatively, a plaintiff can show the practice "predictably will cause" a disparate impact on a group of persons because of a protected characteristic. (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (c)(2).) In HUD's view, based on the plain language of the FHA and the caselaw interpreting it, "an action with predictable discriminatory effects can be challenged" without waiting until harm is inflicted. (86 Fed.Reg., *supra,* at p. 33595.)

To summarize, the elements of a disparate impact claim in violation of the FHA are (1) a practice that (2) actually causes or, alternatively, predictably will cause (3) a disparate impact on a group of persons because of a protected characteristic. The elements of a segregative effect claim in violation of the FHA are (1) a practice that (2) creates, increases, reinforces, or perpetuates segregated housing patterns because of a protected characteristic.

### 4. *Pleading an Unlawful Practice*

When alleging a disparate impact in employment in violation of federal law, the plaintiff is obliged to isolate and identify the specific employment practices alleged responsible for the disparate impact. (See *Meacham v. Knolls Atomic Power Laboratory* (2008) 554 U.S. 84, 100.) We conclude the same degree of particularity is required when pleading a discriminatory effect claim under the FHA. Here, the acts and omissions constituting the unlawful practice were identified in Martinez's allegation that the City failed to accommodate and to provide opportunities to develop lower income housing "through its failure to comply with Housing Element Law." The failures to comply with the Housing Element Law were alleged in detail in Martinez's first three causes of action and those allegations were incorporated into her fifth cause of action alleging a violation of the FHA.

Those omissions included the continuing failure to implement Program 4, which had an initial deadline of December 31, 2016, and resulted in the HCD's August 27, 2018 written findings that the 2015-2023 housing element did not substantially comply with the

54.

Housing Element Law.  (See 42 U.S.C. § 3613(a)(1) [FHA's two-year statute of limitation]; *Havens Realty Corporation v. Coleman* (1982) 455 U.S. 363, 380–381 [continuing violation of the FHA].)  In addition, the City failed to comply with the Housing Element Law when it adopted the amended housing element on March 4, 2019, a failure which is the basis for the peremptory writ of mandate.  Consequently, we conclude Martinez's allegations identify the "practice" element of her FHA cause of action with sufficient particularity.

It follows that we reject the City's argument that the failure to meet an RHNA zoning obligation is not a recognized theory of liability under the FHA—an argument not specifically addressed in a published decision.  Specific precedent is not needed for us to conclude the City's failure throughout the fourth and fifth planning cycle to adopt zoning that accommodates its RHNA qualifies as a "practice" for purposes of alleging a cause of action under the FHA.  (See 78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500 [FHA liability based on a practice's discriminatory effect].)

### 5.    *Pleading the Lack of Sufficient Justification*

The discriminatory practices made unlawful by the FHA "include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods *without any sufficient justification.*" (*Inclusive Communities*, *supra*, 576 U.S. at p. 539.)[23]  Under the FHA's burden-shifting approach to discriminatory effect claims, once a plaintiff has established a prima facie case, the defendant has the burden of proving a sufficient justification.  The shifting of burdens creates the following pleading question:  Must a plaintiff allege facts sufficient to show the absence of a legally sufficient

---

[23]    The 2013 Rules states:  "A legally sufficient justification exists where the challenged practice: [¶] (i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent."  (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (b)(1).)  Because the FHA claim is before this court at the pleading stage, we need not address whether the foregoing provision has been relaxed by the Supreme Court.  (See fn. 22, *ante*.)

justification for challenged practice?  Stated from a different perspective, is it sufficient for a plaintiff to plead only the elements of a prima facie case?  Based on the circumstances presented, we need not resolve this question of pleading law.  Instead, we assume without deciding that a plaintiff must plead the challenged practice is without sufficient justification and conclude Martinez has done so.

This is not the typical pleading case because Martinez has pleaded and proven that the City violated the Housing Element Law.  Thus, the challenged acts and omissions involving zoning are not otherwise lawful, like the facially neutral zoning ordinance adopted in *United States v. City of Black Jack*, *supra*, 508 F.2d 1179.  In other words, the City's practice is illegal for reasons other than being discriminatory.  As stated by the United States Supreme Court, "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid government policies."  (*Inclusive Communities*, *supra*, 576 U.S. at p. 540.)  Here, the City's violation of the Housing Element Law is not a valid government policy—it is the opposite.  (See *Metropolitan Housing Development Corp. v. Village of Arlington Heights* (7th Cir. 1977) 558 F.2d 1283, 1293 [action outside the scope of a governmental body's authority is not entitled to the deference given governmental action within the ambit of legitimately derived authority] (*Metropolitan*).)  Thus, it cannot be regarded at the pleading stage as necessary for achieving legitimate objectives.  Consequently, we conclude Martinez's allegations detailing the City's failure to comply with the Housing Element Law adequately allege the City's practice lacked a "sufficient justification."  (*Inclusive Communities*, *supra*, 576 U.S. at p. 539.)  In the further proceedings after remand, the City will have the burden of proving sufficient justification if Martinez establishes a prima facie case.

6.      *Pleading Causation*

The United States Supreme Court referred to a "robust causality requirement" for FHA disparate impact claims and stated the requirement ensures that racial imbalance does

not, without more, establish a prima facie case and "protects defendants from being held liable for racial disparities they did not create." (*Inclusive Communities*, *supra,* 576 U.S. at p. 542.) "A plaintiff who fails to *allege facts at the pleading stage* or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." (*Inclusive Communities*, *supra,* at p. 543.) *Inclusive Communities* involved a motion for summary judgment, not a motion to dismiss for failure to state a claim. Despite its procedural posture, we conclude the Supreme Court's statement that a plaintiff must allege facts demonstrating a causal connection accurately identifies a requirement for pleading a claim under the FHA and those facts typically are statistics. Consequently, simply pleading the ultimate fact of causation[24] by alleging the challenged practice caused or predictably will cause a disparate impact is insufficient to properly plead the element of causation in an FHA disparate impact claim. Instead, causation must be pleaded with more particularity, which typically includes statistics about the municipality and surrounding communities.

We next consider whether Martinez pleaded enough particular facts to satisfy the causation element of an FHA claim. We note the Ninth Circuit recently stated that "some debate has developed about the contours of the robust causality requirement" and cited a case describing four different views. (See *Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement Dist.* (9th Cir. 2021) 17 F.4th 950, 966 [in opposing summary judgment motion, plaintiff satisfied robust causality requirement]; see *Inclusive Communities Project, Incorporated v. Lincoln Property Company*, *supra*, 920 F.3d at pp. 903–905 [describing views held in the Fourth, Eighth, and Eleventh Circuits].) We need not enter that debate because Martinez's claim under the FHA is not based purely on a

---

[24] Ordinarily, causation is a question of fact not decided on the allegations in a pleading. (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 353; see *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 208 [causation is an ultimate fact].)

57.

disparate impact. It is supplemented by allegations that the City's failure to comply with Housing Element Law constituted intentional discrimination and that the City knew its failure to plan for and accommodate housing affordable to lower income households would have a disparate impact on people of color. We conclude that, just as "[e]vidence of discriminatory intent can bolster a disparate impact case" (*Avenue 6E Investments, LLC v. City of Yuma* (D. Ariz. 2017) 217 F.Supp.3d 1040, 1055 (*Avenue 6E*)), allegations of discriminatory intent can bolster allegations that a disparate impact was caused by the challenged practice.[25]

In addition to the allegations of discriminatory intent, Martinez alleged statistical facts about income and housing burden within Clovis and Fresno County and facts about the City's persistent failure to comply with the Housing Element Law during the fourth and fifth planning cycle. We conclude Martinez's allegations contain enough particularity to adequately allege the City's practice of noncompliance "predictably results in a disparate impact" on persons of color. (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (a).)

### 7. *Pleading a Disparate Impact*

Martinez's allegations address the disparate impact by alleging the violations of the Housing Element Law has an adverse and disparate impact on people of color and the

---

[25] The allegations of discriminatory intent were supported in subsequent proceedings by a transcript of excerpts from the city council's October 15, 2018 meeting. During that meeting (1) a councilmember complained, when told the City cannot require additional amenities for high density projects, "[i]t seems like a hard pill to swallow because we're going to have to lower the Clovis standards"; (2) a councilmember questioned staff whether there were any cities which did not comply with the Housing Element Law and if so, how they did it; (3) a councilmember asked if the RHNA assigned by the Fresno COG could be challenged and staff stating the City was "stuck with those numbers"; (4) a councilmember commenting the law's requirement for by-right zoning without requiring affordable housing units to be built results in "voodoo zoning" since a developer may not present an affordable housing project to the City; and (5) another councilmember complaining Clovis should be a place where lower income people aspire to live once they can afford it.

disparate impacts were predictable, statistically significant, and did not occur by chance. The existence of a disparate impact, which is intertwined with the causation element, is supported by allegations of statistics about the racially and economic composition of Clovis and Fresno County.  We conclude these allegations, which are accepted as true for purposes of a demurrer, are sufficient to state a violation of the FHA under a disparate impact theory.

### 8. Pleading a Segregative Effect

The 2013 Rule states the challenged "practice has a discriminatory effect where it … reinforces[] or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (a).)  Martinez's fifth cause of action for violation of the FHA did not use the word "perpetuate," "segregation," or variants of those terms.  However, her seventh cause of action alleged the City's acts and omissions "create barriers to overcoming patterns of segregation rather than fostering inclusive communities free from barriers."  The fact this allegation is contained in the part of the writ petition labeled as the seventh cause of action does not prevent this court from considering it to determine whether Martinez has alleged a claim under the FHA for a segregative effect.  When examining a pleading to determine if it alleges facts sufficient to state a cause of action under any legal theory, courts examine the entire complaint and are not limited by the labels and structure used in the pleading.  (See *Rosen v. St. Joseph Hospital of Orange County* (2011) 193 Cal.App.4th 453, 458 [courts look past the form of the pleading to its substance].)  Also, the theory was raised in the trial court during the hearing on the demurrer when Martinez's counsel argued the FHA was intended to address disparate impact claims based on the perpetuation of segregated housing and reached not only projects, but policies.

Consequently, we consider whether Martinez alleged facts sufficient to state a claim for relief based on a practice that perpetuates segregated housing.  We conclude Martinez's allegations of statistics about the racially and economic composition of Clovis and Fresno

59.

County from a historical perspective are sufficient to adequately allege the City's *practice* of noncompliance with the Housing Element Law during the fourth and fifth planning periods *perpetuated segregated housing patterns* and, thus, stated a segregative effect claim. As a result, we need not consider whether Martinez should be granted leave to amend to include the detailed information about the City's history and housing patterns contained in (1) the declaration and report from Jessica Trounstine, a political science professor at the University of California, Merced, who has published articles on segregation and land use regulations and (2) the "Analysis of Impediments to Fair Housing Choice," which was approved by the city council on November 4, 2019 and submitted to HUD. (See generally, Code Civ. Proc., § 472c; *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746 ["issue of leave to amend is always open on appeal"].)

The foregoing sets forth our independent analysis of the law, its application to the allegations in Martinez's petition, and our conclusion that Martinez sufficiently alleged violations of the FHA based on a practice that (1) caused or predictably will cause a disparate impact on protected persons or (2) reinforces or perpetuates segregated housing patterns. Consequently, the foregoing fulfills our constitutional obligation to issue a decision "in writing with reasons stated." (Cal. Const., art. VI, § 14.) Nonetheless, because this matter will be remanded for further proceedings, we next describe how the trial court erred in concluding an FHA discrimination claim based on a discriminatory effect theory had not been adequately alleged.

### 9. The Trial Court's Analysis

The trial court's analysis of the Martinez's FHA began by quoting an overview of the principles governing FHA discrimination claims set forth in *Avenue 6E*, *supra*, 217 F.Supp.3d 1040. That case involved the City of Yuma's motion for summary judgment on

the plaintiff developers' disparate impact claim. (*Id*. at p. 1043.)[26]  The district court's

overview of the FHA stated:

> "Under the FHA it is unlawful to 'make unavailable or deny' a 'dwelling' to a
> person because of that person's race, color, religion, sex, familial status, or
> national origin. [(42 U.S.C. § 3604(a).] A dwelling includes 'any vacant land
> which is offered for sale or lease for the construction or location thereon of
> any such building, structure, or portion thereof.'  [(42 U.S.C. § 3602(b).]
> What it means to 'make unavailable or deny' a dwelling is not specifically
> defined in the statute, but municipal land use decisions that block or impede
> the provision of housing are included.  A plaintiff can establish a FHA
> violation under a theory of disparate treatment or disparate impact.  Disparate
> treatment is intentional discrimination; a governmental body cannot 'zone
> land or refuse to zone land out of concern that minorities would enter a
> neighborhood.'  Disparate impact discrimination, on the other hand, includes
> actions taken by 'governmental bodies that create a discriminatory effect upon
> a protected class or perpetuate housing segregation without any concomitant
> legitimate reason.'  Disparate impact ' "permits plaintiffs to counteract
> unconscious prejudices and disguised animus that escape easy classification."
> '  It also 'targets "artificial, arbitrary, and unnecessary barriers" to minority
> housing and integration that can occur through unthinking, even if not
> malignant, policies of developers and governmental entities.'  In a recent case,

---

**26**     Earlier, the Ninth Circuit had reversed the district court's 2013 grant of summary
judgment on the disparate impact claim and its dismissal of the disparate treatment claim.
(*Avenue 6E Investments, LLC v. City of Yuma* (9th Cir. 2016) 818 F.3d 493, 509, 513.)  The
district court had granted summary judgment on the ground a disparate impact could not be
established because similarly priced housing was available elsewhere in Southeast Yuma.
(*Id.* at p. 509.)  The Ninth Circuit concluded the city could not defeat a showing that its
refusal to rezone land to permit construction of affordable housing had a disparate impact on
a minority group simply by showing other similar housing was available in the general area.
(*Ibid.*)

The Ninth Circuit also addressed the dismissal of the disparate treatment claim and
concluded it had been plausibly alleged based on (1) the events leading up to the rezoning
decision, which included a showing of community animus, (2) the city council's rejection of
the unanimous recommendation of its planning and zoning commission and the
recommendation of the planning staff, and (3) the disparate impact and historical
background of the decision, which included statistics about the historical patterns of
segregation by race and class. (*Avenue 6E Investments, LLC v. City of Yuma*, *supra*, 818
F.3d at pp. 504–509.)

*Texas Department of Housing* [*and Community Affairs v. Inclusive Communities Project, Inc.* (2015) 576 U.S. 519,] the Supreme Court affirmed that disparate impact claims were cognizable under the FHA." (*Avenue 6E*, *supra*, 217 F.Supp.3d at p. 1047, fns. omitted.)

Next, the district court analyzed the merits of the city's summary judgment motion by (1) applying the familiar burden-shifting framework, (2) finding the plaintiffs' evidence established a prima facie case of disparate impact and additional evidence of discriminatory animus communicated by citizens to the city council bolstered the disparate impact claim, (3) rejecting the city's arguments that there were legally sufficient reasons for the city's denial of the rezoning request, and (4) concluding there was an issue of fact regarding whether there was an alternative that would have had a less discriminatory effect. (*Avenue 6E*, *supra*, 217 F.Supp.3d at pp. 1047, 1050–1058.) Based on these determinations, the district court denied the city's motion for summary judgment. (*Id.* at p. 1058.)

Here, after the trial court quoted the overview from *Avenue 6E*, it noted the FHA must be interpreted expansively to effectuate its purpose and then set forth the following legal conclusions, with which we disagree:

> "The FHA does not appear to support discrimination liability when nothing has been denied by the municipality. Under the FHA, there is no duty to construct, to plan for, approve and promote any housing. (*San Pedro Hotel Co., Inc. v. City of Los Angeles* (9th Cir. 1998) 159 F.3d 470, 475; *Acevedo v. Nassau County* (2d Cir.1974) 500 F.2d 1078, 1082. Liability in this case is not supported by the plain language of the FHA because RHNA zoning does not 'make' housing 'unavailable' in any material sense or 'deny' housing. Zoning can change, and a developer can always request a zoning change."

Later in its order, the trial court reformulated these conclusions by stating the City "ha[s] done nothing to interfere with any plan to develop property for low-income residents. Instead, [Martinez] want[s] the City compelled to take affirmative steps to aid the development of housing for low-income individuals. The FHA does not appear to encompass such a theory."

First, the trial court erred in concluding that the FHA's discrimination provision is violated only when a municipality has denied something. Restated using the elements of an FHA disparate impact claim, the court concluded, in effect, that the "practice" element is met only when the municipality has denied something. The City has cited, and we have located, no published decision explicitly concluding that a discriminatory practice under the FHA exists only when something has been denied. The correct analysis of the practice element is set forth in part II.B.4. of this opinion. It concludes Martinez's allegations describing the City's failure to comply with the Housing Element Law, including its adoption of the noncompliant amended housing element on March 4, 2019, adequately alleged the "practice" element of her FHA cause of action.

The trial court's error in concluding a municipality violates the FHA's discrimination provision only when it has denied something also can be explained by referring to the statutory phrase "make unavailable or deny," which the district court in *Avenue 6E* stated included "municipal land use decisions that *block or impede* the provision of housing." (*Avenue 6E*, *supra*, 217 F.Supp.3d 1047, italics added.) The trial court's conclusion overemphasizes the statutory term "deny" and its synonym "block" and did not give the proper interpretation to the term "make unavailable" and its synonym "impede." The verb "impede" means "to bar or hinder the progress of; obstruct or delay." (Webster's New World Dict. (2d college ed. 1982) p. 703.) Thus, a municipal practice that delays the availability of housing to people of color is actionable under the FHA.

Furthermore, the phrase "or otherwise make unavailable or deny" (42 U.S.C. § 3604(a)) was identified by the United States Supreme Court as the textual foundation for disparate impact liability under the FHA. (*Inclusive Communities*, *supra*, 576 U.S. at p. 534.) Accordingly, determining whether the challenged practice has made housing unavailable requires a court to determine whether the practice results in a disparate impact. Here, instead of concluding Martinez failed to allege a disparate impact claim because she

did not allege the City denied a rezoning request, permit application or something else, the trial court should have addressed whether Martinez adequately alleged the City's failures to comply with the Housing Element Law "results in a disparate impact on a group of persons" with a protected characteristic. (78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (a).) The appropriate analysis of that question is set forth earlier in this subpart II.B.

Second, the trial court erred by mischaracterizing the relief Martinez sought under her FHA cause of action. The trial court's statement that there is no duty under the FHA to construct, to plan for, approve *and* promote any housing refers to a sentence in *San Pedro Hotel Co., Inc. v. City of Los Angeles* (9th Cir. 1998) 159 F.3d 470 (*San Pedro*), which we quote in full: "While the City is under no duty 'to construct, to "plan for, approve and promote" any housing,' see *Acevedo v. Nassau County*, 500 F.2d 1078, 1082 (2d Cir.1974), the City does have a duty to act in a non-discriminatory manner."[27] (*San Pedro*, *supra*, at p. 476.) In *San Pedro*, the Ninth Circuit determined the plaintiffs properly alleged a breach of this duty, stating: "Because we read [plaintiffs'] complaint to allege discriminatory conduct, we hold that the[y] state a claim under the [FHA]." (*Ibid.*) Thus, the trial court's "no duty" statement does not identify the end of the analysis of Martinez's FHA claim. The court should have continued to the question whether the City had violated the FHA by adopting a

---

[27] *San Pedro* and the decision it quotes were decided before 2015, when HUD clarified the provisions in the FHA about affirmatively furthering fair housing. (See pt. III.C., *post*.) Thus, if the conjunction in the quoted sentence were changed from "and" to "or," the sentence, with that revision, would contradict the duty under the FHA to affirmatively further fair housing.

Similarly, a sentence using "or" would not be compatible with California law. After being amended in 2018, section 65583, subdivision (c)(5) provides that a housing element's program shall "[p]romote and affirmatively further fair housing opportunities and *promote housing* throughout the community or communities for all persons regardless of race" or other protected characteristics. (Stats. 2018, ch. 958, § 2.5, italics added.)

practice that caused a discriminatory effect—that is, resulted in a disparate impact or perpetuated a segregated housing pattern.

The trial court's "no duty" statement also is off point because Martinez is not asking the City to construct, plan for, approve, *and* promote lower income housing. As described in Martinez's appellate briefing, her allegations "seek solely to compel the City to comply with Housing Element Law" and its "ministerial duty to *plan and zone* for over 4,000 affordable housing units." (Italics added.) Thus, the relief Martinez is seeking under her FHA cause of action is the same as the relief obtained on her first three causes of action— namely, writ of mandate directing the City to comply with the Housing Element Law.

The trial court's mischaracterization of the relief sought by Martinez caused it to misapply the fourth factor in the four-factor test adopted in *Metropolitan*, *supra*, 558 F.2d 1283. In *Metropolitan*, the plaintiffs (1) alleged the city's refusal to rezone the plaintiffs' property to allow construction of federally financed low-cost housing violated the equal protection clause and the FHA and (2) requested an injunction compelling the city to rezone the property. (*Id.* at p. 1285.) After a trial, the district court rejected both claims. It concluded the plaintiffs failed to prove the refusal to rezone would adversely affect members of racial minorities, as opposed to poor people generally, and found the city's refusal to rezone was not motivated by racial discrimination or opposition to poor people. (*Id.* at p. 1286.) The Seventh Circuit upheld the finding that the city did not have a discriminatory *motive*, reversed the finding that the zoning decision did not have a discriminatory *effect*, and concluded the city violated the equal protection clause. (*Id.* at pp. 1286–1287.) The United States Supreme Court disagreed with the Seventh Circuit's constitutional analysis, concluded discriminatory intent must be proven to establish an equal protection claim, and reversed. (*Village of Arlington Heights v. Metropolitan Housing Development Corporation* (1977) 429 U.S. 252, 270.) After remand, the Seventh Circuit addressed the remaining statutory issue—whether the refusal to rezone violated the FHA.

(*Metropolitan*, *supra*, at p. 1285.)  The court framed the issue by stating it must determine "under what circumstances conduct that produces a discriminatory impact but which was taken without any discriminatory intent will violate [the FHA]." (*Id.* at p. 1290.)  The court then stated:

> "Four critical factors are discernible from previous cases.  They are: (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [(1976) 426 U.S. 229]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." (*Metropolitan*, *supra*, 558 F.2d at p. 1290.)

We note the Seventh Circuit formulated the fourth factor to fit the circumstances of that case.  The court did not attempt to phrase the fourth factor in a manner that would cover the entire range of governmental acts or omissions that could be addressed in relief granted under the FHA.  As a result, the fourth factor, as phrased, does not apply to the facts of this case because Martinez's FHA claim is not seeking to compel the City to affirmatively provide housing for members of minority groups and is not seeking to restrain the City from interfering with her property rights.

Next, we consider how the Seventh Circuit's discussion of the fourth factor relates to Martinez's request for a writ compelling the City to comply with the Housing Element Law by rezoning sufficient sites to accommodate the RHNA carryover.  That discussion reads:

> "The final criterion which will inform the exercise of our discretion is the nature of the relief which the plaintiff seeks.  The courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing or take affirmative steps to ensure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction.  To require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy.

66.

By contrast, the courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing. [Citation.] The Second Circuit has explicitly relied on the distinction between requiring affirmative action on the part of the defendant and preventing the defendant from interfering with the plaintiff's attempt to build integrated housing in deciding whether to grant relief under the Fair Housing Act. [Citations.]

"This factor favors plaintiffs in this case. They own the land on which [the low-cost housing] would be built and do not seek any affirmative help from the Village in aid of the project's construction. Rather, they seek to enjoin the Village from interfering with their plans to dedicate their land to furthering the congressionally sanctioned goal of integrated housing." (*Metropolitan*, *supra*, 558 F.2d at p. 1293.)

Here, Martinez's FHA cause of action is not seeking to compel the City to appropriate money, actually construct integrated housing, take affirmative steps to ensure such housing is built, or utilize City-owned land in a particular way.[28] Furthermore, the rezoning Martinez seeks is less intrusive on local government autonomy than the rezoning sought in *Metropolitan* because, aside from the application of the FHA, that rezoning decision fell within the wide discretion traditionally afforded a municipality's zoning decisions. (*Metropolitan*, *supra*, 558 F.2d at pp. 1293–1294.) In contrast, Martinez is not attempting to alter an otherwise lawful discretionary decision. She seeks to compel the City to comply with its statutory obligation to zone sufficient sites to accommodate its RHNA. In other words, Martinez is not seeking to compel a local government to take affirmative steps *that are not otherwise required by law* and, thus, is not requesting a "massive judicial intrusion on private [or local government] autonomy." (*Metropolitan*, *supra*, 558 F.2d at p. 1293.) Accordingly, we conclude the trial court erred in determining the relief sought by Martinez precluded her from stating a cause of action under the FHA.

---

**28** While a writ requiring the City to comply with the Housing Element Law requires its city council to take the affirmative step of adopting a zoning ordinance that accommodates the City's RHNA, that affirmative step does not "ensure" integrated or lower income housing actually will be built.

67.

C.      *Discrimination Under the FEHA—the Sixth Cause of Action*

1.      *Statutory Provisions*

The FEHA makes it unlawful for the City to "discriminate through public … land use practices, decisions, and authorizations because of" protected characteristics, including race and source of income.[29]  (§ 12955, subd. (*l*).)  Actionable discrimination includes "restrictive covenants, zoning laws, denials of use permits, and other actions authorized under the Planning and Zoning Law (Title 7 (commencing with Section 65000)), that make housing opportunities unavailable."  (§ 12955, subd. (*l*).)  The Housing Element Law is part of the Planning and Zoning Law.  If zoning laws and other actions *authorized* under the Planning and Zoning Law constitute actionable discrimination when they make housing opportunities unavailable, it follows that zoning laws and other actions that (1) *violate* the Housing Element Law and, thus, the Planning and Zoning Law and (2) make housing opportunities unavailable also constitutes actionable discrimination under the FEHA. Accordingly, Martinez will have stated a discrimination claim under the FEHA if she has adequately pleaded the City's failures to comply with the Housing Element Law "make housing opportunities unavailable" as that phrase is used in section 12955, subdivision (*l*).

Our analysis of the making-unavailable issue is guided by section 12955.8. Subdivision (a) of section 12955.8 addresses how to prove "an intentional violation" of the housing discrimination provisions.  Subdivision (b) of section 12955.8 provides that "[p]roof of a violation causing a *discriminatory effect* is shown if an act or failure to act that is otherwise covered by this part, and that has the effect, regardless of intent, of unlawfully discriminating on the basis of race, color, … source of income," or other protected

---

[29]     The statute currently defines the term " 'source of income' " to include money "paid to a housing owner or landlord on behalf of a tenant, including federal, state, or local public assistance, and federal, state, or local housing subsidies, including, but not limited to, federal housing assistance vouchers issued under Section 8 of the United States Housing Act of 1937 (42 U.S.C. Sec. 1437f)."  (§ 12955, subd. (p)(1).)

68.

characteristic.  (Italics added.)  Based on the statutory text and a review of the legislative history, the Sixth District concluded that the Legislature plainly intended that housing "discrimination under the FEHA could be based upon either disparate treatment or disparate impact."  (*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1419.)  We agree.

Section 12955.8, subdivision (b)'s second sentence addresses unintended discriminatory effects in cases involving a business establishment.  The term "business establishment" refers to entities operating as private business.  (§ 12955.8, subd. (b)(2); see *Brennan B. v. Superior Court* (2022) 13 Cal.5th 662, 679 [interpreting the Unruh Civil Rights Act, Civ. Code, § 51].)  The subdivision's third sentence addresses "cases that do not involve a business establishment."  (§ 12955.8, subd. (b).)  We conclude a governmental entity like the City does not qualify as a "business establishment" and, therefore, is subject to the third sentence.  (See Cheng, et al., Cal. Fair Housing and Public Accommodations (The Rutter Group 2022) § 2:8 [describing a governmental entity as a nonbusiness establishment].)  The third sentence provides that "the person whose action or inaction has an unintended discriminatory effect shall not be considered to have committed an unlawful housing practice in violation of this part if the person can establish that the action or inaction is necessary to achieve an important purpose sufficiently compelling to override the discriminatory effect and effectively carries out the purpose it is alleged to serve."  (§ 12955.8, subd. (b).)

### 2.    *Regulatory Provisions*

Regulations adopted under the FEHA also address intentional housing discrimination practices (Cal. Code Regs., tit. 2, §§ 12040–12042) and practices with a discriminatory effect (Cal. Code Regs., tit. 2, §§ 12060–12063).  The FEHA reaches "practices that are not motivated by discriminatory intent when the practices have a discriminatory effect" and are not "supported by a legally sufficient justification."  (Cal. Code Regs., tit. 2, § 12060, subd.

(a).)  "A practice has a discriminatory effect where it actually or *predictably results in a disparate impact* on a group of individuals, or creates, increases, reinforces, or *perpetuates segregated housing patterns*, based on membership in a protected class.  A practice predictably results in a disparate impact when there is evidence that the practice will result in a disparate impact even though the practice has not yet been implemented."  (Cal. Code Regs., tit. 2, § 12060, subd. (b), italics added; cf. 78 Fed.Reg., *supra,* at p. 11482; 24 C.F.R. former § 100.500, subd. (a).)  Furthermore, a public land use "that is proven … to create, increase, reinforce, or *perpetuate segregated housing patterns* is a violation of the [FEHA] independently of the extent to which it produces a disparate effect on protected classes."  (Cal. Code Regs., tit. 2, § 12060, subd. (b), italics added.)  This provision, like the 2013 Rule, recognizes two kinds of discriminatory effects—disparate impact and segregative effect.

Another similarity between the California regulations and the 2013 Rule is that both adopt a shifting-burden framework, although California's version has two stages instead of three.  First, a "complainant has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."  (Cal. Code Regs., tit. 2, § 12061, subd. (a).)  The California regulations, in contrast to the United States Supreme Court's interpretation of the FHA, do not require *proof* of a robust causal link to establish the prima facie case.  (See Cheng, et al., Cal. Fair Housing and Public Accommodations, *supra*, § 2:8; *Inclusive Communities*, *supra*, 576 U.S. at p. 542 ["robust causality requirement" for disparate impact claims under the FHA].)  Second, after a plaintiff has carried its burden, the local government has the burden by showing "there is a legally sufficient justification of the practice."  (Cal. Code Regs., tit. 2, § 12062, subd. (b).)  Unlike claims under the FHA, a local government's burden under the FEHA includes establishing that "[t]here is no feasible alternative practice that would equally or better accomplish the identified purpose with a

70.

less discriminatory effect." (Cal. Code Regs., tit. 2, § 12062, subd. (b)(4); see Cheng, et al., Cal. Fair Housing and Public Accommodations, *supra*, § 2:8.)

### 3. *Alleging a Discriminatory Effect Claim*

The trial court concluded Martinez's sixth cause of action for violation of the FEHA failed to allege facts sufficient to state a cause of action. The court interpreted the FEHA's language about "zoning laws … that make housing opportunities unavailable" (§ 12955, subd. (*l*)) to mean the same thing as the FHA's provision stating it is unlawful to "make unavailable or deny" a dwelling (42 U.S.C. § 3604(a)). The court determined that "[f]ailing to meet the RHNA obligation for zoning does not make a housing opportunity 'unavailable' in any material sense." The trial court recognized Martinez contended the City had limited housing opportunities and, without sites zoned for affordable housing, the availability of housing for certain protected classes was greatly restricted. However, the trial court believed the facts alleged were more accurately characterized as the City "failing to take action to make housing more available for those protected classes — failure to take a positive step — whereas [section] 12955(*l*) seems to prohibit actions that have a directly negative effect (actions that '*make* housing opportunities unavailable')." This analysis repeats the trial court's error in analyzing the cause of action under the FHA without evaluating whether a disparate impact or segregative effect had been adequately alleged.

Martinez has pleaded and proven that the City violated the Housing Element Law by its continuing failure to meet its RHNA zoning obligation. This continuing failure constitutes a "land use practice" for purposes of section 12955, subdivision (*l*), "an act or failure to act" for purposes of section 12955.8, subdivision (b), and a "practice" for purposes of California Code of Regulations, title 2, section 12060, subdivision (b). Thus, as with her FHA cause of action, Martinez has adequately alleged the "practice" element of an FEHA cause of action for housing discrimination.

71.

Martinez can plead the City's practice "make[s] housing opportunities unavailable" for purposes of section 12955, subdivision (*l*) by adequately alleging the practice had a "discriminatory effect" as that term is used in section 12955.8, subdivision (b). The term "discriminatory effect" includes both a disparate impact and a segregative effect. (Cal. Code Regs., tit. 2, § 12060, subd. (b).) Based on our conclusion that Martinez adequately alleged a disparate impact and a segregative effect under the FHA, we conclude she has adequately alleged those theories under the FEHA and related regulations. (See *Sisemore v. Master Financial, Inc.*, *supra*, 151 Cal.App.4th at p. 1420 [courts interpreting the FEHA often look to cases construing the FHA].)

### 4. Legislative Immunity Does Not Apply

The order sustaining the demurrer to the FEHA cause of action could be affirmed if a statutory immunity applies to the City's practice. The City relies on section 818.2, which provides in full: "A public entity is not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." This provision has not been amended since its enactment in 1963. (See Stats. 1963, ch. 1681, § 1.) The California Law Revision Commission's comment to this provision states in part: "This section recognizes that the wisdom of legislative or quasi-legislative action, and the discretion of law enforcement officers in carrying out their duties, should not be subject to review in tort suits *for damages* if political responsibility for these decisions is to be retained." (Recommendation Relating to Sovereign Immunity, No. 1—Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 801, 841, italics added.)

The City contends the adoption of its amended housing element and the related zoning ordinances are legislative acts and, thus, the "section 818.2 is applicable to the facts of this case." We agree that the City's acts and omissions constitute "adopting or failing to adopt an enactment" for purposes of section 818.2. The City, however, does not analyze whether section 818.2's text applies to a request for writ relief under Code of Civil

72.

Procedure section 1085 or a request for declaratory and injunctive relief. Specifically, the City does not address whether such relief seeks to hold it "liable for an injury" caused by its legislative acts and omissions. (§ 818.2.)

In *Gibson v. County of Riverside* (C.D.Cal. 2002) 181 F.Supp.2d 1057, the plaintiffs sued the county alleging its enacting, enforcing, and refusing to repeal a zoning ordinance establishing an age minimum for residents in certain areas violated the FHA, the FEHA, the Unruh Civil Rights Act, and various constitutional provisions. (*Gibson*, *supra*, at p. 1062.) The county moved for partial summary judgment, asserting, among other things, the defendants were entitled to immunity under section 818.2 and other statutes from any award of damages. (*Gibson, supra,* at pp. 1063–1064, 1086.) The district court stated the various statutory immunities, when applicable, "preclude the imposition of damages on public employees and entities based upon statutes such as the FEHA and the Unruh Act." (*Id*. at p. 1086.) The district court granted partial summary judgment with regard to the FEHA and Unruh Act claims only insofar as they sought damages from the defendants' enactment of the zoning ordinance. (*Gibson*, *supra*, at p. 1086.)

Here, Martinez's cause of action under the FEHA does not seek damages. The City relies on *Esparza v. County of Los Angeles* (2014) 224 Cal.App.4th 452 (*Esparza*), which stated the "immunity granted under section 818.2 precludes the imposition of liability based upon statutes such as FEHA." (*Id*. at p. 461.) In *Esparza*, the plaintiff peace officers alleged six causes of action under the FEHA and six other causes of action, seeking both money damages and injunctive relief. (*Esparza*, *supra,* at pp. 458, 460.) The court concluded their action was "primarily for money or damages, not injunctive relief" and applied section 818.2's immunity. (*Esparza*, *supra,* at p. 460.)

Unlike the FEHA claims in *Esparza*, Martinez's FEHA claim is not for money damages. Thus, the City's immunity argument "overlook[s] the distinction between a tort suit and a mandate action: the former enables the wronged plaintiff to recover compensatory

73.

damages; the latter permits a party suffering from improper governmental action to correct administrative abuse.  The cases have long acknowledged this distinction, one deeply rooted in the theory of our polity."  (*HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 519.)  Thus, "legislative acts, even if improper, find their judicial remedy in the undoing of the wrongful legislation, not in money damages awarded against the state."  (*Ibid.*)

Martinez is seeking to undo the City's failure to comply with the Housing Element Law by obtaining writ relief, declaratory relief, and injunctive relief under her FEHA claim.  Therefore, she is not attempting to hold the City "liable for an injury" for purposes of section 818.2 because she is not seeking money damages.  Consequently, the immunity from liability for damages caused by legislative acts or omissions set forth in section 818.2 does not preclude Martinez from pursuing her FEHA claim.

Therefore, the trial court correctly concluded the legislative immunity does not apply to the sixth cause of action alleging a violation of the FEHA.  Because Martinez has adequately alleged a cause of action under the FEHA and the immunity does not apply, the demurrer to that cause of action should have been overruled.

III.	CLAIMS UNDER SECTIONS 65008 AND 8899.50

Martinez's cross-appeal also challenges the trial court's rejection of (1) her fourth cause of action alleging the City discriminated against lower income housing in violation of section 65008 and (2) her seventh cause of action alleging the City breached its duty to affirmatively further fair housing in violation of section 8899.50.  After the evidentiary hearing, the court determined Martinez had not established either claim and denied declaratory and writ relief under those causes of action.

A.	*Standard of Review*

Martinez sought a writ of mandate pursuant to Code of Civil Procedure section 1085 to remedy the alleged violations of Government Code sections 65008 and section 8899.50.  Ordinary mandamus may be used "to review the legality of a zoning ordinance on grounds

74.

that it is discriminatory." (*Pan Pacific Properties, Inc. v. County of Santa Cruz* (1978) 81 Cal.App.3d 244, 253; *HFH, Ltd. v. Superior Court*, *supra*, 15 Cal.3d at p. 516, fn. 13.)

While "a trial court's ruling under Code of Civil Procedure section 1085 is 'ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence,' " when an appellate court is asked to resolve questions of law on undisputed facts, "then the standard of review requires an independent analysis." (*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 145–146.) Similarly, the resolution of pure questions of law, such as the elements comprising a discrimination cause of action under section 65008, require our independent analysis. (*Pacific Gas & Electric Co. v. Dept. of Water Resources* (2003) 112 Cal.App.4th 477, 491.) Also, when a party challenges the evidentiary support for an underlying decision, we must bear in mind the burden of proof below—if the appellant bore the burden of proof, the question for the reviewing court is whether the evidence *required* a decision in his or her favor as a matter of law, which is an issue we review de novo. (*Vieira Enterprises, Inc. v. McCoy* (2017) 8 Cal.App.5th 1057, 1074.)

B.      *Discrimination in Residential Development – Fourth Cause of Action*

1.      *Statutory Text*

Section 65008, subdivision (b)(1) provides in pertinent part: "No city … shall, in the enactment or administration of ordinances pursuant to any law … prohibit or *discriminate against any residential development* or emergency shelter for any of the following reasons: [¶] … [¶] (C) Because the development or shelter is intended for occupancy by persons and families of very low, low, or moderate income …."[30] (Italics added.) The word

---

**30**     Section 65008 also prohibits enacting or administering ordinances that "prohibit or discriminate against any residential development" because of the owners' or intended occupants' lawful occupation, age, or any characteristic listed in section 12955, subdivision (a) or (d). (§ 65008, subd. (b)(1)(B)(i).)

"discriminate" is not defined in section 65007 (definitions), section 65008 itself, or elsewhere in the Planning and Zoning Law (§ 65000 et seq.).

The word "discriminate" appears in subdivision (b)(1) of section 65008 before the list of protected characteristics set forth in subparagraphs (A) through (D). Based on this structure, it is reasonable to infer "discriminate" was intended to have the same meaning without regard to whether the discrimination was based on (1) the method of financing, (2) a person's lawful occupation, age, race, color, religion, sex, or national origin, (3) the development being intended for lower income persons, or (4) the development being a multi-family residential project. (§ 65008, subd. (b)(1)(A)–(D).)

### 2. Discriminatory Effect

The first question of statutory interpretation involving section 65008, subdivision (b)(1) is whether the word "discriminate" is broad enough to encompass a practice that has a discriminatory effect. Martinez presented this legal question to the trial court by (1) arguing a facially neutral policy or ordinance is discriminatory if it has a disparate impact on lower income housing and (2) citing *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744 (*Building Industry*) and *Keith v. Volpe* (9th Cir. 1988) 858 F.2d 467 (*Keith*) as support. The trial court noted the argument and stated: "However, neither case mentions disparate impact analysis." Subsequently, the trial court observed: "There is little case law on section 65008.

The California Supreme Court has not addressed whether disparate impact or segregative effect claims are cognizable under section 65008. Accordingly, we examine *Building Industry* and *Keith* to determine if they support the principle that discrimination against developments intended to be occupied by lower income persons in violation of section 65008 includes a practice that has a disparate impact. As described below, we conclude they do.

76.

In *Building Industry*, *supra*, 27 Cal.App.4th 744, an action was brought to invalidate a residential growth control initiative adopted by the voters in the City of Oceanside. (*Id.* at p. 748.) One issue raised was whether the voter-approved initiative conflicted with the Planning and Zoning Law (§ 65000 et seq.), including section 65008's prohibition against income-based discrimination. (*Building Industry*, at pp. 762–763, 767–768.) The trial court found the initiative did not offend section 65008 because it was neutral as to the intended occupants of any development. (*Building Industry*, at pp. 770–771.) The appellate court disagreed, noting the trial court disregarded its own factual findings that (1) affordable housing had taken a dramatic decline since the initiative's effective date and (2) the initiative favored the development of larger units on larger lots through an exemption for larger lots. (*Id.* at p. 771.) Next, the appellate court considered and rejected the City of Oceanside's assertion that the exemption was justified by a need to remedy an imbalance in the current housing supply. (*Id.* at p. 771.) Thus, the appellate court concluded the initiative conflicted with section 65008's prohibition against income-based discrimination. (*Building Industry, supra,* at p. 772.)

We recognize the appellate court in *Building Industry* did not use the term "disparate impact" in its discussion. In our view, however, precedent is established by what a court actually does, not whether the opinion uses a particular phrase or buzz word. The actual basis for the appellate court's conclusion that the plaintiff established income-based discrimination in violation of section 65008 is reflected in the following statement:

> "The trial court made key findings that since [the initiative] took effect in 1988, affordable housing in the City had dramatically declined. Only 415 total low income and senior citizen units had been excepted from the effect of [the initiative] in the period between 1987 and 1990, and they were all in the senior category (plus an additional 28 units in the similar fourplex category). Based on those figures, the trial court made an estimate that some 20,000 persons would be denied affordable housing *based on the effect* of [the initiative]. The trial court expressly found that the exception allowing higher priced units on 10,000-square-foot lots was not justified by an asserted

77.

imbalance in the current housing stock, such that higher end units were needed in the City." (*Building Industry*, 27 Cal.App.4th at pp. 769–770, italics added.)

In referring to the dramatic decline in affordable housing and underlying statistics, the court made no mention of the intent underlying the initiative. Thus, the dramatic decline in affordable housing describes an impact—more specifically, a disparate impact. The trial court's estimate that 20,000 persons would be denied affordable housing because of the initiative's *effect* is the equivalent of a finding that the initiative predictably would cause a disparate impact on low-income persons seeking affordable housing.[31] Therefore, we interpret *Building Industry* as a case that actually determined income-based discrimination in violation of section 65008 occurred because of an actual and a predictable disparate impact on lower income housing. Thus, *Building Industry* is precedent for the principle that disparate impact claims are cognizable under section 65008, subdivision (b)(1)(C).

Our analysis of *Keith*, *supra*, 858 F.2d 467, also supports the conclusion that disparate impact claims are cognizable under section 65008, subdivision (b)(1)(C).[32] In *Keith*, the plaintiffs were concerned with the dislocation of people living in the path of a planned freeway and sought injunctive relief against the City of Hawthorne (Hawthorne) when it refused to approve a proposed 96-unit apartment complex. The plaintiffs alleged the denial of the developer's applications for the project resulted in unlawful discrimination against minority and low-income persons displaced by the freeway construction. (*Keith, supra,* at pp. 470, 471–472.) After conducting evidentiary proceedings, the district court

[31] The noun "effect" is a synonym of "impact." For example, a definition in a California environmental regulation states: " 'Cumulative *impacts*' refer to two or more individual *effects* which, when considered together, are considerable or which compound or increase other environmental *impacts*." (Cal. Code Regs., tit. 14, § 15355, italics added.)

[32] A federal decision on an issue of California law is not binding precedent but it may be instructive to the extent its analysis is sound. (See *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 175; *Roe v. Hesperia Unified School District* (2022) 85 Cal.App.5th 13, 27, fn. 5.)

agreed, finding Hawthorne had violated the FHA and section 65008. As a result, the district court enjoined Hawthorne from prohibiting construction of the units. (*Keith, supra,* at p. 473.) The Ninth Circuit affirmed.

The plaintiffs in *Keith* claimed, among other things, that Hawthorne's denial of the developer's applications violated section 65008's prohibitions against discrimination in housing based on race and income. (*Keith*, *supra*, 858 F.2d at p. 485.) Accordingly, we consider each type of discrimination.

With respect to racial discrimination, the Ninth Circuit noted there was no California case law regarding the proof necessary to establish a violation under section 65008. Lacking precedent from the California Supreme Court, the Ninth Circuit stated it was required to make a reasonable determination as to how the California Supreme Court would decide the case. (*Keith, supra,* 858 F.2d at p. 485.) Because section 65008's prohibition of racial discrimination appears to serve the same purpose and its language is similar to the FHA, the appellate court determined it was reasonable to conclude the proof necessary to establish race discrimination under both statutes was the same. (*Keith*, *supra,* at p. 485.) Because the plaintiffs had proven a claim under the FHA, the Ninth Circuit concluded the plaintiffs also established racial discrimination in violation of section 65008. (*Keith*, *supra,* at p. 485.) The FHA claim had been proven by plaintiffs showing Hawthorne's refusal to allow the project to be built "had twice the adverse impact on minorities as it had on whites" and that "showing established a racially discriminatory effect." (*Keith*, *supra,* at p. 484.)

With respect to discrimination based on income, the Ninth Circuit noted the California Supreme Court had not specified the standard of proof necessary to establish income-based discrimination under section 65008 but had held a plaintiff alleging wealth-based discrimination in violation of the California Constitution need not show discriminatory intent. (*Keith*, *supra*, 858 F.2d at p. 485.) Thus, the Ninth Circuit determined California courts would conclude that intentional discrimination need not be

79.

proven to establish income-based discrimination under section 65008. (*Keith*, *supra*, at p. 485.)

Having resolved that legal issue, the Ninth Circuit addressed whether the district court's factual finding that Hawthorne's denial of the developer's applications adversely affected low-income individuals was clearly erroneous.[33] (*Keith*, *supra*, 858 F.2d at p. 485.) The evidence showed (1) most of the displaced residents were from low-income households, (2) there was insufficient existing or planned low-income housing in Hawthorne to house them, and (3) unless more low-income housing became available, many displaced residents would have to leave Hawthorne to find affordable housing. (*Ibid.*) By preventing the project's construction, the displaced persons were deprived of a potential opportunity to remain in the city, while wealthier individuals were not likely to be affected since there was no deficit of moderate- or high-income housing and few of the displaced persons were in the higher income brackets. (*Ibid.*) "Because the City's actions adversely affected only low-income persons, the district court correctly concluded that Hawthorne's denial of the [developer's] applications violated" section 65008. (*Keith*, *supra,* at p. 485.) Based on the foregoing, we conclude *Keith* is another case in which a claim of income-based discrimination in violation of section 65008 was established by proof of a disparate impact on lower income persons.

---

[33] The district court addressed whether section 65008 requires the plaintiffs "to prove intent to discriminate on the basis of wealth, or merely that the actions have a discriminatory effect on low income persons." (*Keith v. Volpe* (C.D. Cal. 1985) 618 F.Supp. 1132, 1158.) Because the California Supreme Court held de facto discrimination based on wealth was sufficient to prove a constitutional violation, the district court concluded "proof of discriminatory effect" was sufficient to establish a violation of section 65008 based on wealth, and the evidence showed Hawthorne's denial of the developer's applications had "an unmistakably adverse impact on low income persons." (*Keith v. Volpe*, at pp. 1158–1159.) Based on the district court's use of the terms "discriminatory effect" and "adverse impact," it is clear the court recognized discrimination under section 65008 could be proven by an unintentional disparate impact.

Returning to the text of section 65008, subdivision (b)(1), we consider whether the word "discriminate" encompasses or excludes discriminatory effects proven by a disparate impact on persons with a protected characteristic. Under the principle that the whole of a statute should be considered, we note that section 65008, subdivision (h) states: "The Legislature finds and declares that *discriminatory practices that inhibit* the development of housing for persons and families of very low, low, moderate, and middle incomes, or emergency shelters for the homeless, are a matter of statewide concern." (§ 65008, subd. (h), italics added.) The reference to "practices that inhibit" supports the inference that the Legislature was concerned with the effect of a practice, not simply the intent underlying the practice. (§ 65008, subd. (h).)

Interpreting the word "discriminate" in section 65008, subdivision (b)(1) to encompass practices with a discriminatory effect is compatible with the textual analysis adopted by the United States Supreme Court in *Board of Education v. Harris* (1979) 444 U.S. 130. There, the court addressed how to interpret a federal statute that prohibited "racial 'discrimination' in the 'assignment of employees.' " (*Id*. at p. 139.) The employer argued that a disproportionate impact alone, without proof of purposeful discrimination, was insufficient. (*Ibid*.) The court reviewed the statute's text, history, purpose, and structure and construed the term "discrimination" to encompass disparate impacts. (*Id*. at pp. 140–141.)

Interpreting section 65008, subdivision (b)(1) to allow a discrimination claim to be proven by a disparate impact makes that provision consistent with the way discrimination is established under the FHA (*Avenue 6E*, *supra*, 217 F.Supp.3d 1047 [FHA violation can be established under a theory of disparate treatment or disparate impact]) and the FEHA (*Sisemore v. Master Financial, Inc.*, *supra*, 151 Cal.App.4th at p. 1419 [FEHA violation can be based on either disparate treatment or disparate impact]; § 12955.8, subd. (b)). Based on how discrimination claims are established in other contexts, it is extremely unlikely that the

81.

Legislature used the word "discriminate" to express an intent to exclude claims based on a discriminatory effect. Consequently, we conclude the word "discriminate" in section 65008, subdivision (b)(1) encompasses practices with a discriminatory effect, which includes a disparate impact.

### 3. Trial Court's Decision

We next consider whether the trial court committed legal error in analyzing Martinez's fourth cause of action alleging a violation of section 65008. Martinez alleged the City failed "to comply with state laws intended to facilitate the development of housing affordable to lower-income households," which had a disparate impact on persons with very-low and low incomes.[34] Martinez argued the City's "administration of the Overlay and its refusal to comply with state law to identify sites with minimum densities of 20 units/acre for affordable housing has a disparate impact on people with low incomes."

The trial court, after concluding neither *Building Industry* nor *Keith* mentioned a disparate impact analysis in discussing section 65008, set forth a description of Martinez's arguments about a disparate impact on lower income persons, and then stated:

> "The court finds that there is no viable claim here, as Petitioners have
> identified no action that the City has taken that would limit housing
> opportunities for lower income families and individuals. What petitioners
> have shown is that the City, in some minor respects, has not done enough to
> promote and advance development for low income housing."[35]

---

[34] Martinez's fourth cause of action also alleged violations of section 65008 based on (1) intentional discrimination against lower income people and people of color and (2) disparate impact based on race and ethnicity. Martinez opening brief states her cross-appeal is pursuing a violation of section 65008 only on the ground of "the adverse and disparate impact on lower-income people." Martinez, however, appears to use the term "disparate impact" to include a practice that perpetuates segregated housing patterns.

[35] This analysis echoes the approach taken by the trial court in erroneously sustaining the demurrer to the discrimination claims under the FHA and the FEHA. (See pt. II.B. & II.C., *ante*.) Also, the City's failure to zone sufficient sites to accommodate its RHNA has

The trial court noted Martinez's argument "that the failure of the housing element to impose the minimum densities mandated by section 65583.2(h) steers development of the rezoned sites away from higher density, thereby discriminating against low-income families." Martinez's reference to steering development away from higher density describes how the disparate impact was caused. The trial court did not reject the argument by finding (1) higher density housing development was not, in fact, affected by having to compete with lower density housing development for sites within the RHN Overlay or (2) this competition did not, in fact, cause a disparate impact. Instead, the trial court rejected the argument based on an interpretation of section 65008.

The trial court's interpretation recognized "a distinction between [1] failing to take sufficient steps pursuant to a very complex statutory scheme to promote and facilitate development of housing for low income individuals, and [2] taking some action that 'prohibit[s] or discriminate[s]' against such development." Applying this distinction, the trial court concluded Martinez had not shown that "failing to do enough to promote high density housing for low-income persons is the equivalent of prohibiting or discriminating against such." Under this statutory interpretation, a failure to comply with certain provisions of the Housing Element Law would never "discriminate against any residential development" (§ 65008, subd. (b)(1)) intended for occupancy by lower income persons and, as a result, the factual issue whether the noncompliance with the Housing Element Law "actually or predictably results in a disparate impact on a group" with a protected characteristic would not be considered and resolved under the burden-shifting framework. (Cal. Code Regs., tit. 2, § 12060, subd. (b); 24 C.F.R. § 100.500, subd. (a) (Feb. 15, 2013) [discriminatory effect].)

---

existed since the start of its fourth cycle and the adoption of its 2008-2013 housing element. This prolonged failure is not accurately described as minor.

We reject the trial court's statutory interpretation and its application to the facts of this case. We conclude an "enactment or administration of ordinances"—such as the City's adoption of the ordinances included in its amended housing element—can be shown to "discriminate against a[] residential development" intended to be occupied by lower income persons if it had discriminatory effect on the development of affordable housing. (§ 65008, subd. (b)(1)(C).) Thus, proving a discriminatory effect that violates section 65008 can be accomplished by establishing a disparate impact.

Consequently, the absence of a provision in section 65008 that defines "enactment or administration of ordinances" to include violations of the Housing Element Law generally or the RHNA requirements in particular does not prevent a plaintiff from establishing such a violation resulted in a disparate impact and, therefore, constitutes discrimination prohibited by section 65008. Conversely, we conclude a violation of the Housing Element Law does not automatically constitute a violation of section 65008 because the plaintiff must also prove a discriminatory effect, intentional discrimination, or a combination of the two to establish the prohibited discrimination.

In summary, we conclude the trial court committed legal error in its analysis of Martinez's discrimination claim under section 65008, which was based on a discriminatory effect on housing intended for lower income households. As a result, the section 65008 claim, along with the discrimination claims under the FHA and FEHA, must be remanded for further proceedings to determine whether the City's failure to comply with the Housing Element Law had a discriminatory effect on persons of color or on lower income housing; this determination must be made using the burden-shifting framework applicable to such discrimination claims.

84.

### 4. A Discriminatory Effect Cannot be Found as a Matter of Law

Our conclusion that Martinez's three discrimination claims must be remanded for further proceedings is based on our rejection of Martinez's argument that judgment on the fourth cause of action alleging a violation of section 65008 should be entered in her favor.

Before deciding whether the evidence establishes such a claim as a matter of law, we must determine the standards used to establish a discrimination claim under section 65008, subdivision (b)(1)(C) based on a discriminatory effect. We conclude California law should be internally consistent and, thus, the standards used to prove a discriminatory effect for a housing discrimination claim under the FEHA also apply to a discrimination claim under section 65008, subdivision (b)(1)(C). Under those standards, we consider whether the evidence, as a matter of law, compels a finding that (1) the violations of the Housing Element Law (2A) actually (i) causes or (ii) "perpetuates" or (2B) "predictably results in [(3)] a disparate impact" on housing development intended to be occupied by lower income persons. (Cal. Code Regs., tit. 2, § 12060, subd. (b).) "A practice predictably results in a disparate impact when there is evidence that the practice will result in a disparate impact even though the practice has not yet been implemented." (*Ibid*.) We also consider whether the evidence compels a finding that the City's violations of law "reinforces[] or perpetuates segregated housing patterns, based on membership in a protected class." (*Ibid*.)

Martinez contends her evidence of disparate impact demonstrates that zoning is the primary factor in the economic disparity in Clovis. This evidence includes the declaration and report of Trounstine. Trounstine was retained to determine whether the City's RHN overlay "is likely to affect the demographic characteristics of Clovis going forward." Trounstine compared Clovis and Fresno, and concluded Clovis is whiter and wealthier than Fresno, housing is more expensive in Clovis, and Clovis's residential land use regulations are more stringent than Fresno's. Trounstine opined: (1) "[t]he weight of the evidence indicates that it is highly probable that residential land use regulations have significantly

85.

affected Clovis['s] demographic makeup"; (2) "[i]t is extremely unlikely" the difference in demographic composition and housing costs between Clovis and Fresno happened by chance; and (3) "the recently adopted overlay ordinance is highly unlikely to substantially ameliorate these differences."

In reaching her conclusions, Trounstine noted that while the RHN Overlay allows for by-right high-density development, nearly all the sites allow lower density development. Trounstine opined this "tend[ed] to produce lower density development" because: (1) high-density development of affordable units is an expensive undertaking, with most financing sources requiring public comment and approval by elected officials; (2) "[r]esearch suggests that most homeowners prefer that any new residential development in their neighborhood be low-density, single-family units"; (3) homeowners are "the most vocal and active participants in local politics" and if given the chance are likely to argue for reduced density; and (4) "[t]hese preferences mean elected officials are unlikely to voluntarily promote higher density housing and may even work to block it," thereby generating delays and higher development costs. Trounstine opined "[w]hen parcels are zoned with a minimum (high) density, affordable housing projects are less likely to be derailed."

Based on the evidence in the appellate record, we conclude a finding that Martinez has established her prima facie case of housing discrimination under section 65008 is not compelled as a matter of law. Resolving the factual issues of whether the City's noncompliance with the Housing Element Law actually causes or predictably results in a disparate impact or perpetuates segregated housing patterns involves a weighing of evidence and drawing inferences, a task best left to the trial court in its role as the finder of fact. Because this opinion clarifies the various ways Martinez's three discrimination causes of action may be proven (which involves slightly different shifting-burden frameworks for the federal and state claims), procedural fairness dictates that the evidence should be reopened

86.

to allow each side the opportunity to present evidence consistent with the principles adopted in this opinion.[36]

C.     *Affirmatively Furthering Fair Housing—Seventh Cause of Action*

In 2018, the Legislature enacted a statute requiring local governments to affirmatively further fair housing (AFFH).  (Stats. 2018, ch. 958, § 1.)  The mandatory AFFH duty greatly increases the responsibilities on local governments in administering their land use and housing policies.  As explained below, compliance requires more than simply refraining from discrimination.  To establish context for the Legislature's decision to impose the AFFH duty on all cities and counties in California, we provide an historical overview.  (See generally, Williams, *Affirmatively Further Fair Housing: California's Response to a Changing Federal Landscape* (2019) 28 J. Affordable Housing & Community Dev. L. 387, 388–393 [history of federal and state laws] (*Williams*).)

1.     *The AFFH Duty's History*

The AFFH duty goes back to the 1968 enactment of the FHA.  (Sen. Com. on Appropriations, Rep. on Assem. Bill No. 686 (2017-2018) as amended June 13, 2018, p. 1.)  Before enactment of the FHA, "governments disproportionately invested in the schools, parks, and other public amenities in white neighborhoods, while communities of color were left marginalized.  Not coincidentally, the property values of homes in white communities grew far more quickly than those in other neighborhoods, meaning that white homeowners built greater equity than their counterparts.  The built-in economic advantage these white homeowners received, coupled with the ongoing access to better schools and other public amenities, led to entrenched cycles of wealth and opportunity for white households.  The inverse effect drove cycles of poverty in many communities of color."  (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 1.)

---

[36]    Nothing in this opinion implies, one way or the other, how the trial court should exercise its discretion if a party requests that discovery be reopened.

"Upon enactment of the FHA, housing discrimination was no longer legal. However, at that point the financial, social, and geographic disparities were so entrenched that they reproduced themselves independently of the law.  The result is that, according to multiple academic studies, housing disparities are as bad or worse as they were 50 years ago, as well as their concomitant negative outcomes.  For example, according to a 2020 study from the Federal Reserve, White households have a median wealth of $188,200, whereas for Black households that figure is $24,100, and for Latinx households it is $36,100."  (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 1.)

Due to the entrenched nature of the problem, "the FHA did not just outlaw housing discrimination" but attempted "[t]o rectify existing disparities" by obligating "federal government agencies involved in housing and urban development to administer their programs and activities 'in a manner that affirmatively furthers fair housing.' "  (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 1; see 42 U.S.C. § 3608, subd. (d).)  HUD administers the AFFH provisions in the FHA.  "According to HUD, 'The [FHA] not only prohibits discrimination but, in conjunction with other statutes, directs HUD's program participants to take significant actions to overcome historic patterns of segregation, achieve truly balanced and integrated living patterns, promote fair housing choice, and foster inclusive communities that are free from discrimination.' "  (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, pp. 1–2.)

"The AFFH provisions of the [FHA] went largely overlooked until, in 2015, the Obama Administration promulgated the Affirmatively Furthering Fair Housing Rule." (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 2.)  "The AFFH rule required HUD grantees to examine barriers to fair housing choices and access to opportunity within their jurisdictions, and submit this examination to HUD for review and acceptance.  Completion of this process became a prerequisite to

receiving funding for housing development from HUD." (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 2.) "[T]he implications for HUD and the enforcement of the long-neglected AFFH provision of the FHA were profound." (Julian, *The Fair Housing Act at Fifty: Time for a Change* (2019) 40 Cardozo L.Rev. 1133, 1141.)

"In [January] 2018, the Trump Administration suspended the AFFH rule, and rescinded it in 2020, citing that the rule was unworkable, and that it would facilitate the construction of housing for low-income households in suburban communities. In June of 2021, the Biden Administration reinstated the Obama-era AFFH rule." (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 2; Sen. Com. on Appropriations, Rep. on Assem. Bill No. 686 (2017-2018 Reg. Sess.) as amended June 13, 2018, p. 2.) In 2018, after the federal AFFH rule had been suspended, the California Legislature enacted Assembly Bill No. 686 and added section 8899.50 to the Government Code. (2018 Stats. ch. 958, §1, eff. Jan. 1, 2019.)

Section 8899.50 requires public agencies to affirmatively further fair housing and "also required cities and counties to consider AFFH in their housing element's implementation plan. By placing AFFH provisions into housing element law, the California law expanded its reach to all cities and counties, rather than just those that receive federal funding for housing developments." (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 2; see § 8899.50, subd. (a)(2)(B) [definition of public agency includes cities].)[37]

---

[37] The program included in a housing element must "affirmatively further fair housing opportunities and *promote housing* throughout the community or communities for all persons regardless" of a variety of protected characteristics. (§ 65583, subd. (c)(5), italics added.) In addition, the program must include "an assessment of fair housing in the jurisdiction" that contains the specified components. (§ 65583, subd. (c)(10).)

In 2021, the Legislature adopted Assembly Bill No. 1304 (2021-2022 Reg. Sess.) to clarify the AFFH analysis requirements in response to deficiencies identified in the HCD's review of new housing elements submitted by local governments in their sixth cycle housing elements. (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 2; see 2021 Stats. ch. 357, § 1.) The bill also clarified section 8899.50 "to ensure that there is no future confusion that the general AFFH duty is mandatory and enforceable in the courts." (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 2; see § 8899.50, subd. (b)(2).)

### 2. Statutory Text

Section 8899.50, subdivision (b)(1) provides that "[a] public agency shall administer its programs and activities relating to housing and community development in a manner to affirmatively further fair housing, and take no action that is materially inconsistent with its obligation to affirmatively further fair housing." Compliance with this AFFH provision is "a mandatory duty." (§ 8899.50, subd. (b)(2); see § 14 [shall is mandatory].) One secondary authority describes section 8899.50 as "a stand-alone obligation for public agencies to affirmatively further fair housing." (Cheng, et al., Cal. Fair Housing and Public Accommodations, *supra*, § 2:4.)

> " 'Affirmatively furthering fair housing' means taking meaningful actions, in addition to combating discrimination, that overcome patterns of segregation and foster inclusive communities free from barriers that restrict access to opportunity based on protected characteristics. Specifically, affirmatively furthering fair housing means taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns, transforming racially and ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws. The duty to affirmatively further fair housing *extends to all of a public agency's activities and programs relating to housing and community development.*" (§ 8899.50, subd. (a)(1), italics added.)

The Legislature expressly required section 8899.50 to "be interpreted consistent with the Affirmatively Furthering Fair Housing Final Rule and accompanying commentary published by [HUD] contained in Volume 80 of the Federal Register, Number 136, pages 42272 to 42371, inclusive, dated July 16, 2015.  Subsequent amendment, suspension, or revocation of this Final Rule or its accompanying commentary by the federal government shall not impact the interpretation of this section."  (§ 8899.50, subd. (c).)

### 3.	Trial Court's Decision

After the hearing on the merits, the trial court addressed Martinez's seventh cause of action by referring to section 8899.50's requirement to affirmatively further fair housing, describing only a portion of the definition of the phrase " '[a]ffirmatively further fair housing' " (§ 8899.50, subd. (a)(1)), and stating:

> "Petitioners argue that the City's failure to rezone sites to minimum densities as required by the Housing Element Law, resulting in a discriminatory impact on Black and Latinx persons, flatly contravenes this duty.  [¶]  As discussed above, the court disagrees with Petitioners' disparate impact analysis.  Petitioners do not prevail on the seventh cause of action."

On appeal, Martinez argues her "unrebutted evidence … established Clovis's longstanding pattern and practice of evading statutory obligations to create opportunities for low-income people and households of color."  She argues the trial court erred in denying her section 8899.50 cause of action because a determination that the City violated the Housing Element Law compels a finding that the City took "action that is materially inconsistent with its obligation to affirmatively further fair housing."  (§ 8899.50, subd. (b)(1).)  We agree.

### 4.	The Statutory Duty Extends Beyond Not Discriminating

No California appellate court has interpreted section 8899.50.  Therefore, interpreting its provisions presents this court with legal issues of first impression.  (See *Coburn v.*

91.

*Sievert* (2005) 133 Cal.App.4th 1483, 1492 [questions of statutory construction are questions of law subject to independent review].)

The first question we consider is whether the trial court erred by interpreting section 8899.50 too narrowly by concluding section 8899.50 had not been violated based on its finding that section 65008 had not been violated. Thus, the court impliedly construed section 8899.50 as simply repeating the prohibition against discrimination contained in section 65008. The City contends "[t]he trial court's approach in applying its analysis of the discrimination claims to section 8899.50 makes sense and promotes consistency." The City argues the word "affirmatively" demonstrates "liability takes place when an entity does something affirmative (usually denying a proposed project) to actually prevent lower income housing from being constructed."

Our interpretation of section 8899.50 begins with the words of the statute itself, giving them their plain and ordinary meaning. (*Merced Irrigation Dist. v. Superior Court*, *supra*, 7 Cal.App.5th at p. 924.) The wording of section 8899.50 unambiguously demonstrates it does more than prohibit acts of discrimination. It *prohibits certain acts* by stating a public agency shall "take no action that is materially inconsistent with its obligation to affirmatively further fair housing." (§ 8899.50, subd. (b)(1).) It also *requires action* by stating a public agency must administer its programs "in a manner to affirmatively further fair housing." (*Ibid*.) The required "meaningful action" includes "combating discrimination," addressing "significant disparities in housing needs," and "replacing segregated living patterns" with balanced living patterns. (§ 8899.50, subd. (a)(1).) Therefore, based on the plain meaning of its words, section 8899.50 does more than simply prohibit public agencies from engaging in discrimination.

Our conclusion that section 8899.50's plain meaning requires public agencies to do more than refrain from housing discrimination leads to the question of whether the plain meaning produces absurd consequences that the Legislature did not intend or frustrates the

manifest purpose of the legislation. (*Merced Irrigation Dist. v. Superior Court*, *supra*, 7 Cal.App.5th at 924.) The Legislature has aided our inquiry into its intent and the purpose of section 8899.50 by directing that the statute be interpreted consistent with a federal regulation and accompanying commentary published by HUD in 2015. (§ 8899.50, subd. (c); see 80 Fed. Reg. 42272-01 to 42371 (July 16, 2015).)

The 2015 commentary to the federal regulation states that the FHA's provisions for affirmatively furthering fair housing "include more than the [FHA's] anti-discrimination mandates." (80 Fed. Reg. at p. 42273 (July 16, 2015).) The federal requirement to affirmatively further fair housing "is not only a mandate to refrain from discrimination but *a mandate to take the type of actions that undo historic patterns of segregation and other types of discrimination* and afford access to opportunity that has long been denied." (*Ibid.*; see *N.A.A.C.P. v. Secretary of Housing & Urban Development* (1st Cir. 1987) 817 F.2d 149, 155 [FHA requires HUD to do more than simply refrain from discriminating and aiding discrimination by others].) The California AFFH duty must be interpreted in the same manner. (§ 8899.50, subd. (c).) Consequently, our inquiry into legislative intent and section 8899.50's purpose supports the adoption of its plain meaning, which requires more than refraining from discrimination.

Consequently, the trial court erroneously concluded its rejection of the discrimination claim under section 65008 also resolved the alleged violation of section 8899.50's duty to affirmatively further fair housing. The scope of section 8899.50's AFFH duty goes beyond simply prohibiting a public agency from discriminating in its housing programs and zoning.

### 5. *Violations of the AFFH Duty*

Next, we consider Martinez's argument that the violations of the Housing Element Law proven in this case compel a finding that the City violated the AFFH duty set forth in section 8899.50, subdivision (b)(1). We conclude they do.

Initially, we note that section 8899.50 became effective on January 1, 2019. Consequently, we address the City's acts and omission after that date. After January 1, 2019, the City continued in its failure to zone for sufficient sites to accommodate its RHNA. In particular, the amended housing element adopted by the city council on March 4, 2019, failed to comply with the Housing Element Law.

Accordingly, we consider whether the City's 2019 acts and omissions relating to the amended housing element qualify as a public agency's administration of "programs and activities relating to housing and community development" as that phrase is used in section 8899.50, subdivision (b)(1). We conclude there is no ambiguity. It is not reasonable to interpret the language about administering a "program[]" or "activit[y] relating to housing" as excluding acts and omissions involving a housing element in a public agency's general plan. The City does not contend otherwise. Thus, we conclude as a matter of law that the City's acts and omissions in 2019 related to the amended housing element qualify as the administration "programs and activities relating to housing and community development" for purposes of section 8899.50, subdivision (b)(1).

Next, we consider whether the City's acts and omissions in 2019 were done "in a manner" that did not "affirmatively further fair housing." (§ 8899.50, subd. (b)(1).) The connection between a municipality's housing element and fair housing is demonstrated by the legislative findings in the Housing Element Law that refer to the "provision of housing affordable to low- and moderate-income households" and the responsibility of local governments "to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community." (§ 65580, subds. (c), (d).) These findings show that one purpose of the Housing Element Law and its requirement that municipalities zone sufficient sites to accommodate their RHNA is to further affordable housing for lower income households.

94.

Consequently, we conclude as a matter of law that the violations of sections 65583, 65583.2(h), and 65584.09 that are the basis for a judgment in Martinez's favor on her first three causes of action establish that the City has failed to "affirmatively further fair housing" in violation of section 8899.50, subdivision (b)(1).  Restated using the language in the statutory definition of " '[a]ffirmatively furthering fair housing,' " the City failed to "foster[] and maintain[] compliance with … fair housing laws."  (§ 8899.50, subd. (a)(1).)

Accordingly, after remand, judgment should be entered in Martinez's favor on the portion of her section 8899.50 cause of action that is based solely on the City's violations of the Housing Element Law.  The writ relief granted on the first three causes of action requires the City to comply with the Housing Element Law and, thus, provides adequate relief for this specific breach of the AFFH duty.  Martinez's appellate briefing does not argue for more extensive relief for this particular violation of section 8899.50, subdivision (b)(1).

Next, we consider the other part of Martinez's section 8899.50 cause of action, which is reflected in her contention that any practice "that creates or perpetuates a disparate impact on protected classes … is inconsistent with section 8899.50 explicit mandate to "address significant disparities in housing needs and in access to opportunity, replacing segregated living patterns with truly integrated and balanced living patterns."  (§ 8899.50, subd. (a)(1).)  In other words, if a municipality is engaging in housing discrimination, it is not affirmatively furthering fair housing.  We conclude a practice with a discriminatory effect on persons of color or housing intended to be occupied by lower income households also violates the AFFH duty.  Because Martinez's discrimination causes of action are remanded

from further proceedings, this portion of her section 8899.50 claim must also be remanded for consideration with her discrimination claims.[38]

6.      *Section 8899.50 Is Enforceable by Ordinary Writ of Mandate*

Section 8899.50 does not include a provision stating how it is to be enforced.  In comparison, section 65583, subdivision (h) states that "[a]n action to enforce the program actions of the housing element shall be brought pursuant to Section 1085 of the Code of Civil Procedure."  Consequently, another novel question of statutory interpretation is whether an ordinary writ of mandate under Code of Civil Procedure section 1085 may be used to enforce section 8899.50.  Code of Civil Procedure section 1085, subdivision (a) states that a court may issue a writ of mandate "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station."

In 2021, the Legislature addressed the enforcement of section 8899.50 by adding subdivision (b)(2), which states in full:  "A public agency shall have a mandatory duty to

---

[38]    Because Martinez's opening appellate brief only raised two grounds—violations of the Housing Element Law and discrimination—for how the City violated the AFFH duty, we need not address whether other acts or omissions by the City violated its AFFH duty.  Thus, we do not address whether the City failed to take other "meaningful actions," including (1) "combating discrimination," (2) actions that "overcome patterns of segregation," (3) actions eliminating "barriers that restrict access to opportunities based on protected characteristics", (4) actions addressing "significant disparities in housing needs," (5) actions addressing "significant disparities … in access to opportunity," (6) "replacing segregated living patterns with truly integrated and balanced living patterns," (7) "transforming racially and ethnically concentrated areas of poverty into areas of opportunity," and (8) "fostering and maintaining compliance with civil rights and fair housing laws."  (§ 8899.50, subd. (a)(1).)  As a result, we need not consider (1) whether there are there patterns of segregation within the City's boundaries that trigger the obligation to take meaningful action to overcome those patterns; (2) whether there are barriers that restrict access to opportunities and, if so, are the barriers or restrictions based on protected characteristics; (3) whether there are "significant disparities in housing needs" and, if so, whether the City taken action to address those disparities; (4) whether there are "significant disparities … in access to opportunities" and, if so, has the City taken action to address those disparities; and (5) whether there are racially or ethnically concentrated areas of poverty within the City's boundaries that trigger the obligation to transform those areas.

96.

comply with paragraph (1). This paragraph is a clarification of existing law and shall not be deemed a change in previous law enacted by Chapter 958 of the Statutes of 2018." The Assembly Floor Analysis of Assembly Bill No. 1304 (2021-2022 Reg. Sess.) addressed the enforcement of section 8899.50, noted a trial court had concluded the statute did not provide a private right of action to enforce the duty to affirmatively further fair housing, and stated the "bill would clarify current law to ensure that there is no future confusion that the general AFFH duty is mandatory and enforceable in the courts." (Assem. Floor Analysis of Assem. Bill No. 1304 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 3.)

Based on this legislative history and the use of the term "mandatory duty" in section 8899.50, we conclude the duty to affirmatively further fair housing is enforceable in court and an ordinary writ of mandate is an appropriate mechanism for enforcing that duty. (See *Coast Community College Dist. v. Commission on State Mandates* (2022) 13 Cal.5th 800, 815 [legal compulsion is present when the local entity has a mandatory, legally enforceable duty to obey].)

## DISPOSITION

We reverse the judgment issuing the peremptory writ of mandate to the extent the writ is based on the trial court's finding the amended housing element does not satisfy the requirements of section 65583.2, subdivision (g) because it does not include the required analysis for sites within the P-F Zone. We otherwise affirm the trial court's issuance of a peremptory writ of mandate compelling respondents to: (1) adopt "a housing element for the 2015-2023 planning period that substantially complies with Government Code section 65754"; and (2) implement Program 4 "by zoning or rezoning an adequate number of sites, compliant with Government Code Section 65583.2(h), to accommodate the City's unmet share of the RHNA from the 2008-2013 planning period, pursuant to Government Code section 65584.09."

97.

We reverse the judgment to the extent it (1) resolved the fourth and seventh causes of action in favor of the respondents and (2) dismissed the fifth and sixth causes of action based on the trial court's August 11, 2020 order sustaining the City's demurrer to those causes of action.  The matter is remanded to the trial court for further proceedings not inconsistent with this opinion.  The judgment entered after those further proceedings shall provide that Martinez prevailed on the part of her seventh cause of action based on the violations of the Housing Element Law established in her first three causes of action.

Martinez is awarded to her costs on appeal.

FRANSON, J.

WE CONCUR:

DETJEN, Acting P. J.

DeSANTOS, J.

98.